THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BONZELL LAMAR JOYNER, Defendant-Appellant.

Second District    No. 2—99—0433

Opinion filed November 8, 2000.—Rehearing denied December 7, 2000.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RAPP delivered the opinion of the court:

A jury in the circuit court of Kane County convicted defendant, Bonzell Lamar Joyner, of the murder of Armando Mendez. The trial court sentenced defendant to natural life imprisonment. Defendant appeals, raising the following contentions: (1) that the State failed to prove him guilty beyond a reasonable doubt; (2) that prosecutorial misconduct deprived him of a fair trial; (3) that he was deprived of the assistance of counsel at proceedings on posttrial motions; and (4) that the trial court erred in sentencing him to natural life imprisonment. We affirm the conviction but modify the sentence.

## I. FACTS

Defendant was charged with first-degree murder (720 ILCS 5/9—1(a) (West 1994)) for the October 27, 1994, shooting death of Armando Mendez. The State sought the death penalty. Prior to trial, defendant waived his right to a sentencing hearing before a jury. A jury trial was held in April 1997.

The record indicates that shortly after 10:50 p.m. on October 27, 1994, Aurora police responded to a shooting at Harper's gas station located at 1116 East New York Street, Aurora. Harper's consists of a lighted canopy over several gas pumps and a small building with a window through which business is conducted. Officers found the victim lying in front of the building with a large pool of blood around his head. The victim's 1979 Cadillac was located one-half block east of Harper's on East New York Street. The vehicle's hazard lights were on, and a gas can was sticking out of the gas fill located under the rear license plate.

Israel Ramos testified that on the night in question he was driving on East New York Street with his friend Jaime Juarez when he saw a vehicle stalled and a group of men fighting. Israel pulled into Harper's and saw a few black men beating a Hispanic man. The black men hit the Hispanic man across the back with a garbage can. During the beating, the Hispanic man tried to cover himself and get to the gas station attendant's window.

Israel further testified that a blue Chevrolet automobile pulled up. A person wearing a black "hoodie" and some sort of sports jacket walked in front of Israel's car holding his hand at his waist. The hood was tied tightly around the man's head so that his face could not be seen. The hooded man then walked up behind the victim, pointed a gun at the back of his head, and fired once. The shooter walked back toward the blue Chevrolet, and the man who was driving the blue Chevrolet told the shooter not to get in the vehicle. The shooter attempted to lift the door handles on the passenger side, but the doors were locked. The blue Chevrolet left the scene, and the shooter ran away.

Jaime Juarez testified that he was a passenger in Israel Ramos's car on the night in question. Jaime saw a Hispanic male at Harper's who was running from four or five black males. The Hispanic man was trying to get into the building. The black males were taking turns punching and kicking the Hispanic man and bouncing a garbage can off his body. As Israel pulled into Harper's, other vehicles pulled up, including a blue Chevrolet. One of the black males who was in the group beating the Hispanic man walked toward the blue Chevrolet, reached into the front passenger window, and then walked back to-

ward the victim. The black male walked up to the Hispanic man, put a gun to his head, and fired. The shooter then walked back to the blue Chevrolet and lifted up on the door handles, but could not get into the vehicle. The blue Chevrolet pulled out of Harper's and the shooter ran.

Jaime said that the shooter was very thin and not tall. The shooter was wearing black pants and a pullover black and blue "hoodie" with a Georgetown bulldog emblem. Jaime also remembered someone wearing a red and black flannel shirt among those beating the victim.

Tracy Parish testified that she was working at Harper's on the night in question. That night, a man came to the window and asked to borrow a gas can. Tracy told him that she could only sell him a gas can but that he should try the gas station west of Harper's. Tracy watched the man walk to the west, then shortly thereafter back to the east toward his disabled vehicle. Next, she saw three or four black men punching and throwing stones at the man near his disabled vehicle. The man would fall down, get back up, and they would knock him down again as he made his way toward Harper's. As the man got closer to the building, the black men picked up a garbage can and hit him over the head. One of the black men held the man up against the window of the building and pulled out a small shiny gun. Tracy dropped to her knees and heard a gunshot. Tracy described the shooter as a black male with high cheekbones, a wide forehead, and wearing a hood. Tracy did not identify defendant in court. However, the morning after the shooting, a police investigator showed her a photo lineup consisting of six photographs, including defendant. Tracy pointed to the picture of defendant and said that she was 70% sure he was the shooter because of his high cheekbones and wide forehead.

On cross-examination, Tracy said that she did not think the shooter was among the group of people who were beating the victim. Tracy specified that the shooter held the victim against the window, held the gun in his right hand, and placed the gun against the victim's temple. Tracy believed the shooter had a flannel shirt on over a hooded sweatshirt. She did not see any sports logos on the shooter's clothing.

The State called Keith Smith, a truck driver who lived in the neighborhood at the time of the shooting. Keith testified that as he drove home from work on the night in question he saw a car blocking the right lane of East New York Street and five black men beating a Hispanic man. The Hispanic man ran toward Harper's and a couple of the black men chased him. The Hispanic man appeared to knock on the booth in an attempt to get some assistance.

Keith pulled into Harper's with his headlights shining on the beating. The black men picked up a garbage can and used it to beat the

Hispanic man over the back. When the victim was lying on the ground, the black men kicked him several times.

Keith saw one of the shorter black individuals walk away from the beating out of his line of sight. A few moments later, the man returned and raised his right arm to the victim's head. Keith heard a loud noise, and the victim collapsed. The shooter looked at the victim and then turned and looked around.

At this point in Keith's testimony the following exchange took place:

"Q. And when he looked around, did you have occasion then to see him?

A. Yes, I did.

Q. Can you describe what you saw for us?

A. Um, it was just a look on his face, um, maybe pride, satisfaction, whatever.

[Defense Attorney]: Objection, Your Honor, move to strike.

THE COURT: Sustained. You're instructed to disregard. Proceed."

Keith saw the shooter from about 12 to 15 feet away. Keith made an in-court identification of defendant as the shooter.

Keith further testified that the shooter went to a blue Chevrolet and attempted to open the front passenger door, but the occupants would not let him into the vehicle. The blue Chevrolet drove away, and the shooter ran.

Keith testified that he had seen the individuals involved in the incident, including defendant, around the neighborhood almost on a daily basis. In 1994, it was not unusual to come home and find defendant sitting on his front step. Keith explained that the individuals involved in the beating were all wearing dark-colored clothing and that one of the individuals wore a plaid jacket. Keith identified the individual with the plaid jacket as Priest Pryor.

On cross-examination, Keith stated that he was never asked to identify the shooter or anyone else involved in the incident prior to trial. On the night of the shooting, Keith told the police that he could identify the individuals involved if he saw them again and that he recognized the shooter, but he did not indicate that the shooter had sat on his front step in the past.

Next, the State called Darryl Bailey, a member of the Gangster Disciples street gang, who was also charged with first-degree murder for his role in the Armando Mendez homicide. Darryl explained that he had entered into an agreement with the State to testify at the trial of defendant and other defendants involved in the crime. In exchange for his cooperation, Darryl would plead guilty to several unrelated

charges and would be sentenced to 12 months in prison in one case and to 48 months' probation in another. The first-degree murder charge would be dismissed. Although not testified to at trial, the agreement indicates that the State would dismiss the first-degree murder charge upon Darryl's completion of the agreement because Darryl had been shot twice since he agreed to testify.

Darryl stated that he knew defendant to be a member or associate of the Gangster Disciples. Darryl identified defendant in court. Darryl testified that defendant carried the rank of "enforcer" in the gang. The enforcer is responsible for administering punishments in the form of physical beatings to gang members who violated gang rules. Darryl's testimony concerning defendant's rank of enforcer was stricken, and the jury was instructed to disregard it because Darryl's knowledge of this fact was based upon hearsay.

Darryl testified further that, on the evening in question, he was talking with a Gangster Disciple named Eric Mott when they noticed a Cadillac with tinted windows pull up on East New York Street. Darryl and Eric ran away because they thought someone was going to shoot. Next, Gangster Disciples Jason Foster, Patrick Kirkwood, and Gabe Robinson pulled up in Foster's car. Eric told them that there was a "King," meaning a member of the Latin Kings street gang, up on the corner. Darryl, Patrick Kirkwood, Eric Mott, Gabe Robinson, and Kevin Scott ran to the Cadillac, and Jason Foster drove away. When the Hispanic man came back to the car, Patrick Kirkwood asked him if he was a King and to "throw down the crown," meaning to invert the Latin King gang sign in disrespect, if he was not a King. The Hispanic man failed to make the gang sign so Patrick Kirkwood hit him in the face. The Hispanic man ran toward Harper's, and the Gangster Disciples chased him. Priest Pryor, another Gangster Disciple, pulled up in his blue Chevrolet, got out of the car, ran up, and hit the Hispanic man. The Gangster Disciples hit and kicked the Hispanic man and threw a garbage can at him. Darryl stated that he was not participating at that point; rather, he was yelling for them to stop before they killed the man. Next, Jason Foster's car pulled up, and defendant got out with a black gun. Darryl testified that he turned around, and he heard a gunshot as he ran away.

On cross-examination, Darryl admitted that he told the police that he would say whatever he needed to in order to stay out of jail. Darryl did not think that defendant was wearing a hood on the night in question.

The State also called Kevin Scott, who admitted he was a Gangster Disciple and was charged with first-degree murder for his role in the murder of Armando Mendez. Kevin entered into an agreement to

testify at defendant's trial in exchange for the State's reduction of the first-degree murder charge to aggravated battery and mob action. Kevin testified that he knew defendant to be a Gangster Disciple and identified defendant in court. Kevin stated that Harper's and the area around it was in the "hood" of the Gangster Disciples and that they had to "beat down" any enemies, including Latin Kings, that entered their hood.

Kevin testified that, on the evening of the shooting, he was with Latrone and Patrick Kirkwood when they met up with Darryl Bailey and Eric Mott. At that point, Jason Foster's car pulled up and someone yelled "hey y'all, there's a King up on New York Street." A few men got into Jason Foster's car while Kevin, Eric Mott, and Darryl Bailey walked to East New York Street. Kevin said that, when they got there, they saw the victim surrounded by Patrick Kirkwood, Latrone Kirkwood, and Gabe Robinson. Patrick Kirkwood said "throw down the crown." When the victim did not, Patrick Kirkwood punched him in the face. The victim ran toward Harper's. A blue Chevrolet pulled up and Priest Pryor and Taurus House got out. Priest Pryor and Taurus House ran up to the victim and began to punch and kick him. Kevin said that by the time he and the others got to the victim, Priest Pryor had the victim's face up against the cashier's window at Harper's. Everyone, including Darryl Bailey, was kicking, punching, and hitting the victim with a trash can. According to Kevin, Jason Foster's car pulled up, defendant got out and said "get the f--- out [of] the way, everybody move." Defendant reached back into Jason Foster's car and brought out a small black gun. Defendant covered his face, walked toward the victim and shot him once in the head. At that point, Jason Foster's car pulled out. Defendant tried to get into Priest Pryor's blue Chevrolet as it pulled away, but he could not so defendant ran away.

On cross-examination, Kevin admitted that he would lie to get out of trouble and that he initially told the police that he knew nothing about a shooting. When he heard the State was seeking the death penalty in his case, he told his lawyer to cut a deal.

The record indicates that the Aurora police stopped Priest Pryor's blue Chevrolet approximately one mile from Harper's around midnight on the night of the shooting. A handprint was located on the rear passenger window. Illinois State Police forensic scientist Joseph V. Ambrozich testified that the latent handprint from the blue Chevrolet matched the handprint on the printcard of defendant. Ambrozich acknowledged that he could not determine the age of the handprint.

Phillip Nigel Robbin (Nigel) testified on defendant's behalf. Nigel said that defendant is a friend he has known for six or seven years.

According to Nigel, he picked up defendant at about noon on October 27, 1994. They drove around until 10:30 or 11 p.m., when they went to an apartment. Tammy Stewart and her aunt were at the apartment. At about 12:30 or 1 a.m., he and Tammy took defendant home. Nigel stated that he and defendant were never at or near Harper's gas station on October 27, 1994.

Shalanda Stewart testified that she had been defendant's girlfriend from 1991 through 1994. Although she is not defendant's girlfriend anymore, she still loves him and considers him a friend. On October 27, 1994, at about 10:30 p.m., defendant came to her apartment with Nigel. Defendant was wearing maroon pants and a multicolored shirt. Defendant left her apartment around 11:30 p.m. with Tammy Stewart and Nigel.

Tammy Stewart and Annette Stewart also testified that defendant came to the apartment around 10 p.m. and that Tammy and Nigel took defendant home around midnight.

Defendant testified on his own behalf. He stated that on October 27, 1994, a little after 10 p.m., he went to his girlfriend's apartment with Nigel. Shalanda Stewart, Annette Stewart, Tammy Stewart, and Lynette Stewart were at the apartment. Defendant testified that Nigel and Tammy Stewart took him home around midnight. Defendant said he was wearing a red, green, and white sweater and dark red pants that night.

Defendant testified further that he was an associate of the Gangster Disciples. He knows a Gangster Disciple named Priest Pryor who owns a blue Chevrolet. Defendant stated that he was near that vehicle in Farnsworth Park sometime within the week prior to the shooting and, at that time, he specifically remembered touching the rear passenger window with his hand. Defendant knew Pryor, House, Scott, Bailey, Foster, Robinson, Mott, and the Kirkwoods and knew them to be Gangster Disciples, but he did not see any of them on October 27, 1994. Defendant testified that he was not at Harper's gas station between the hours of 10 p.m. and midnight on October 27, 1994, and that he did not shoot Armando Mendez.

When defendant spoke to the police about the events of October 27, 1994, defendant said that he was with Shalanda and Annette Stewart but failed to mention the other names because he did not want to get them involved. Defendant admitted that he lied to the police when he told them that he took a cab to Shalanda's apartment. Defendant claimed that he did not want to involve Nigel because Nigel had been in trouble with the police.

The jury deliberated on the foregoing evidence and returned verdicts of guilty on four counts of first-degree murder. The trial court

found that defendant qualified for the death penalty under section 9—1(b)(11) of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(11) (West 1994)).

Defendant filed a *pro se* motion to dismiss his court-appointed trial counsel alleging ineffective assistance of counsel, as well as various conflicts of interest that he claimed his trial counsel labored under. The motion prayed for a new trial. The trial court appointed attorney Jay Wiegman to represent defendant on the motion to dismiss counsel. Attorney Wiegman filed a motion to withdraw as appointed counsel stating that the allegations raised in defendant's *pro se* motion were without merit.

No evidence was presented at the proceeding on defendant's *pro se* motion. Instead, attorney Wiegman stated his findings. The trial court also heard from defendant's trial counsel, who explained certain circumstances regarding defendant's allegations, and the State argued that defendant's motion should be denied. The trial court denied defendant's motion.

Subsequently, defendant filed a *pro se* motion to reconsider the ruling that raised additional allegations of ineffective assistance of trial counsel. Attorney Wiegman determined that this motion was also without merit. Defendant argued his motion to the court, and his trial counsel explained the circumstances regarding defendant's allegations. The State argued that the motion should be denied. The trial court denied defendant's motion to reconsider.

A posttrial motion for a new trial was denied. In sentencing defendant, the trial court found that two mitigating factors precluded imposition of the death penalty, namely, defendant's youth and his lack of significant criminal history. In finding defendant eligible for a term of natural life imprisonment, the trial court reiterated its finding that a death penalty eligibility factor was present and found further that the murder of Armando Mendez was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The trial court pronounced a sentence of natural life imprisonment. Defendant's motion to reconsider the sentence was denied. This timely appeal followed.

## II. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant first argues that his conviction should be reversed because the State failed to prove him guilty beyond a reasonable doubt. Defendant contends that the State failed to prove that he was the person who shot Armando Mendez because no physical evidence connected defendant to the murder; the State did not present

evidence to refute defendant's alibi; and the eyewitness testimony was inconsistent, conflicting, and was given in part by two codefendants.

■ The relevant inquiry in reviewing the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Perez,* 189 Ill. 2d 254, 265-66 (2000). The identification of the accused by a single witness is sufficient to sustain a criminal conviction if the witness viewed the accused under circumstances allowing a positive identification. *People v. Lewis,* 165 Ill. 2d 305, 356 (1995).

■ Defendant argues that Keith Smith's testimony cannot reasonably be accepted as reliable because his opportunity to observe was brief and there were 1½ years between the shooting and his identification of defendant at trial. We disagree. The length of time between the commission of the crime and the identification goes only to the weight to be given the testimony, which was a question for the jury to resolve. *People v. Vasquez,* 313 Ill. App. 3d 82, 103 (2000). The testimony of Keith Smith, when viewed in the light most favorable to the State, establishes that defendant shot the victim. Smith saw defendant from about 12 to 15 feet away, under ample lighting, and while paying a great deal of attention. We also note that Smith was familiar with defendant before the night of the shooting.

■ Defendant argues that the testimony of Darryl Bailey and Kevin Scott should be viewed with skepticism and suspicion because they are codefendants and entered into agreements with the State where they were given leniency in exchange for their testimony. While such testimony is subject to careful scrutiny, the testimony of an accomplice, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of defendant's guilt beyond a reasonable doubt. *People v. McLaurin,* 184 Ill. 2d 58, 79 (1998).

■ Defendant also argues that the eyewitness testimony was inconsistent and conflicting. Conflicts and inconsistencies in testimony do not necessarily establish reasonable doubt. *People v. Baldwin,* 256 Ill. App. 3d 536, 542 (1994). The record shows that the witnesses' statements were generally consistent and varied only in minor respects, which is to be expected anytime several persons witness the same event under traumatic circumstances. See *People v. Brooks,* 187 Ill. 2d 91, 133 (1999). After carefully reviewing the record, we do not believe these inconsistencies and conflicts were such that a rational trier of fact could not have found defendant guilty beyond a reasonable doubt.

■ Defendant's claim that there was no physical evidence connecting him to the crime has no merit. While the testimony of the identify-

ing witnesses alone was sufficient to sustain defendant's conviction, the handprint found on the blue Chevrolet is indeed physical evidence linking defendant to the crime.

■ Defendant argues that his alibi witnesses were not conclusively refuted and, therefore, cast adequate doubt upon the eyewitness identifications. However, reasonable doubt is not created by the mere existence of alibi evidence. *People v. Killingsworth*, 314 Ill. App. 3d 506, 510 (2000). The weight to be given alibi evidence is a question of credibility for the jury, which has no obligation to believe alibi evidence over positive identification. *People v. Jackson*, 237 Ill. App. 3d 712, 718 (1992). The evidence was sufficient for a rational trier of fact to find defendant guilty of first-degree murder beyond a reasonable doubt.

## B. PROSECUTORIAL MISCONDUCT

■ Defendant's second argument on appeal is that two instances of prosecutorial misconduct deprived him of a fair trial. The first instance concerns the testimony that defendant carried the rank of "enforcer" in the gang. This testimony was stricken and the jury was instructed to disregard it because the basis of the witness's knowledge was hearsay. Defendant contends that the insinuation was extremely prejudicial because it made the jury more likely to believe that defendant was the shooter. Although not requested at trial, defendant contended in his posttrial motion and now on appeal that the trial court erred in failing to declare a mistrial *sua sponte*. Defendant urges us to review the issue pursuant to the plain-error rule.

In order to preserve for review on appeal an issue that could have been raised during trial, defendant must object at trial and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The plain-error rule permits a reviewing court to consider issues that have been waived by the accused when the evidence is closely balanced or when the error is so fundamental and of such magnitude that the accused was denied a fair trial. *People v. Lucas*, 151 Ill. 2d 461, 482 (1992). The evidence in this case was not closely balanced. As we discussed above, there was direct identification of defendant by three eyewitnesses.

In any event, we find no merit in defendant's argument. The trial court should grant a mistrial only where the jury has been so influenced and prejudiced that it would not, or could not, be fair and impartial and where the damaging effect of the evidence cannot be remedied by instructions. *People v. Aleman*, 313 Ill. App. 3d 51, 65 (2000). Juries are presumed to follow the trial court's instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Defendant has failed to

show that any damage was not remedied by instructing the jury to disregard the testimony.

■ The second instance of prosecutorial misconduct that defendant contends deprived him of a fair trial was the prosecutor's use of the word "pride" in his closing argument. During Keith Smith's testimony, Smith described a look of pride on defendant's face after defendant shot the victim. The testimony was objected to, the objection was sustained, and the jury was instructed to disregard the testimony. Then, at the beginning of the State's closing argument, the prosecutor said:

> "On October 27, 1994, the Gangster Disciples sent a message to everybody who would listen, to friend and foe alike, that invaders would not be tolerated.
>
> * * *
>
> *** [T]he loudest message of all, ladies and gentlemen, was sent by that man, the defendant. He sent that message with *pride*, with conviction, he sent that message by taking a gun to the head of Armando Mendez and pulling the trigger." (Emphasis added.)

Because defendant did not object to the comment during the prosecutor's closing argument and defendant's posttrial motion does not raise the issue, it is waived. See *Enoch*, 122 Ill. 2d at 186. The plain-error rule is not applicable because the evidence in this case was not closely balanced, and we fail to see how the error is so fundamental and of such magnitude that defendant was denied a fair trial. See *Lucas*, 151 Ill. 2d at 482.

Nevertheless, where a prosecutor's remarks exceed the bounds of proper comment, a reviewing court should not disturb the verdict unless it can be said that the remarks in question resulted in substantial prejudice to the accused such that absent those remarks the verdict would have been different. *People v. Culley*, 286 Ill. App. 3d 155, 168 (1997). We do not believe the prosecutor's use of the word "pride" was improper, and in any event, defendant has failed to show that the verdict would have been different absent this remark.

## C. DEPRIVATION OF THE ASSISTANCE OF COUNSEL

■ Defendant's third argument on appeal is that he was deprived of the assistance of counsel at the proceedings on his posttrial *pro se* motions alleging ineffective assistance of his trial counsel. Defendant contends that, although a new attorney was appointed to represent him in proceedings on his *pro se* motions, the attorney did not function as his advocate. Instead, the attorney filed a motion to withdraw as counsel and argued that the allegations in defendant's *pro se* motions lacked merit. Defendant urges us to vacate the order denying defendant's *pro se* motions and remand the cause for the appointment of new counsel and a hearing on the allegations in the motions.

When a defendant files a *pro se* motion for new trial alleging that his trial counsel was ineffective, the trial court should conduct a preliminary investigation of defendant's allegations. *People v. Nitz*, 143 Ill. 2d 82, 134 (1991). If the trial court determines that the allegations are spurious or pertain to matters of trial strategy, then no new counsel need be appointed. *Nitz*, 143 Ill. 2d at 134. If, however, the allegations show possible neglect of the case, new counsel should be appointed to argue defendant's claims of ineffective assistance of counsel. *Nitz*, 143 Ill. 2d at 134-35.

The trial court appointed attorney Wiegman to represent defendant on his *pro se* motions but then called upon him to evaluate defendant's allegations and report his findings to the court. Attorney Wiegman found that the motions had no merit, and he argued that position to the court. Attorney Wiegman did not act as defendant's advocate in the proceedings on these motions. However, because we believe the trial court conducted a proper preliminary investigation as required by *Nitz*, we find that defendant was not deprived of counsel at proceedings on his *pro se* motions.

Defendant argues that, when his first *pro se* motion to dismiss trial counsel came before the trial court, the court immediately recognized that the allegations showed possible neglect of the case and did not find it necessary to solicit trial counsel's explanation of the circumstances before appointing counsel. We disagree.

When the motion was called to the trial court's attention, counsel was appointed, but the trial court conducted no preliminary investigation of defendant's allegations at that time. Although attorney Wiegman is referred to as counsel for defendant on his *pro se* motions, attorney Wiegman actually was enlisted by the trial court to participate in the preliminary investigation of defendant's allegations.

The proceedings on defendant's *pro se* motions were not evidentiary hearings. Rather, the proceedings consisted of attorney Wiegman's explanation of his factual and legal findings concerning the allegations, an explanation from defendant's trial counsel, and argument from the State. We note that such interchange between the court and defendant's trial counsel is appropriate during the preliminary investigation of defendant's allegations of ineffective representation. See *People v. Jackson*, 131 Ill. App. 3d 128, 139 (1985).

At the conclusion of the proceeding on defendant's first *pro se* motion, the allegations of failure to communicate and unethical performance were found to be conclusions unsupported by facts. The trial court concluded that the alleged failure to provide defendant with all of the discovery materials, if true, was a matter of trial strategy. The alleged conflict of interest due to defendant's trial counsel's represen-

tation of Eric Mott and Latrone Kirkwood was spurious because each defendant had separate, nonantagonistic alibis, and counsel withdrew from those cases before defendant's trial. With regard to the alleged conflict of interest based on defendant's filing of a complaint against his trial counsel with the Attorney Registration and Disciplinary Commission, the trial court found that such a situation does not necessarily create a conflict of interest and that there was no conflict at the time of trial because the complaint was filed after the trial concluded. Finally, the trial court found that the allegations concerning the failure to call certain witnesses were matters of trial strategy.

At the conclusion of the proceedings on defendant's second *pro se* motion, the trial court found that the allegation concerning trial counsel's failure to challenge the accuracy of the palm print found on the blue Chevrolet to be a matter of trial strategy because defendant claimed the print was put on the car before the night of the shooting. With respect to the allegation that trial counsel did not properly impeach the State's witnesses, the trial court found this was a matter of trial strategy.

We conclude that the trial court adequately inquired into defendant's allegations of ineffective assistance of counsel and found that they lacked merit or were matters of trial strategy. That being the case, defendant's right to new counsel to represent him on his *pro se* motions never existed. Neither the fact that attorney Wiegman was purportedly appointed to represent defendant and did not do so nor the fact that he assisted the court in the preliminary investigation of defendant's allegations affected defendant's right to counsel. Therefore, we hold that defendant was not deprived of the assistance of counsel at the proceedings on his *pro se* posttrial motions.

## D. NATURAL LIFE IMPRISONMENT

■ Defendant raises several issues regarding his sentence of natural life imprisonment. Understanding defendant's contentions requires a review of the three stages of a death penalty case. Initially, a judge or jury determines whether the State has proved defendant guilty of first-degree murder beyond a reasonable doubt (stage one); next, a judge or jury determines whether the State has proved beyond a reasonable doubt that defendant is eligible for the death penalty (stage two); and finally a judge or jury determines whether there are mitigating factors to preclude the death sentence (stage three). 720 ILCS 5/9—1 (West 1994).

■ A trial court has the discretion to sentence a defendant to natural life imprisonment if it finds (1) that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cru-

elty, or (2) that any of the death penalty qualifying factors are present. 730 ILCS 5/5—8—1(a)(1)(b) (West 1994). In this case the trial court specifically found that both factors were present.

Defendant argues that the trial court's erroneous belief that he was eligible for the death penalty requires resentencing, even though he was sentenced to natural life, because the trial judge had the wrong sentencing range in mind. See *People v. Hargis*, 118 Ill. App. 3d 1064 (1983).

In reviewing the second finding set out above, we see that defendant was found eligible for the death penalty pursuant to the aggravating factor set forth in section 9—1(b)(11) that provides for death sentence eligibility where defendant was 18 years or older at the time of the offense, and where

> "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1994).

Defendant contends that the record in this case does not support the trial court's conclusion that the murder was premeditated and that it occurred pursuant to a preconceived plan or design. We agree.

■■■ Our supreme court has recently explained death penalty eligibility under this section in *People v. Williams*, 193 Ill. 2d 1, 37 (2000):

> "[T]o establish that a murder defendant is death eligible under section 9—1(b)(11), the State must prove more than that the murder was technically premeditated. Section 9—1(b)(11) requires that the murder be 'cold,' *i.e.*, not motivated by mercy or the emotion of the moment, and that it be 'calculated and premeditated, pursuant to a preconceived, plan, scheme or design,' *i.e.*, deliberated or reflected upon for an extended period of time."

Time is an essential element of the section 9—1(b)(11) aggravating factor and "proof of a substantial period of reflection or deliberation is required to render a defendant death eligible." *Williams*, 193 Ill. 2d at 31.

■■ The evidence indicates that defendant deliberately walked up to Armando Mendez, who was dazed and defenseless, placed a gun to his head, pulled the trigger, and ended his life. The trial court found that defendant was associated with the other Gangster Disciples and did not just show up at Harper's and shoot Armando Mendez for a non-gang-related reason. The trial court also found that "defendant arrived at the scene with murder in his heart." The trial court further

found that Jason Foster's car initially came to the scene, people got out of the car, and it then left the scene, returning a short time later with defendant, who was brandishing a gun.

At most, this evidence establishes that defendant had formed the intent to murder Armando Mendez just minutes before the shooting, when he was picked up by Jason Foster and learned there was a perceived Latin King in the Gangster Disciple's "hood." There was no evidence, however, that defendant deliberated or reflected upon the murder of Armando Mendez for an extended period of time, as is required under section 9—1(b)(11). On the record before us we must conclude that no reasonable trier of fact could have found beyond a reasonable doubt (720 ILCS 5/9—1(b)(11)) (West 1994) that the murder was committed in a "premeditated manner pursuant to a preconceived plan, scheme or design." Accordingly we vacate the trial court's finding of death penalty eligibility.

Next, we examine the trial court's finding that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. Defendant argues that if we find that the death penalty qualifying factor was not proved beyond a reasonable doubt then the recent United States Supreme Court decision of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), mandates the reduction of defendant's sentence to 60 years, the maximum term available for first-degree murder. In his reply brief, defendant contends that the discretionary natural-life-imprisonment statute is rendered unconstitutional by *Apprendi* and therefore his natural life sentence cannot stand.

The *Apprendi* Court held unconstitutional a New Jersey hate crime statute that increased the normal 5- to 10-year range of imprisonment for possession of a firearm for an unlawful purpose to a 10- to 20-year term if the trial judge found, by a preponderance of the evidence, that defendant acted with a purpose to intimidate an individual or a group because of that person's race, color, gender, handicap, religion, sexual orientation, or ethnicity. *Apprendi*, 530 U.S. at 468-69, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. The *Apprendi* Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The Supreme Court explained that "the relevant inquiry is not one of form but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494, 147 L. Ed. 2d at 457, 120 S. Ct. at 2365.

110

■ The constitutionality of the natural life sentence authorized by section 5—8—1(a)(1)(b) in light of the *Apprendi* decision is an issue of first impression. To sustain a charge of first-degree murder a jury must find that the State proved all of the elements of the offense beyond a reasonable doubt. A guilty verdict for first-degree murder allows a sentence ranging from 20 to 60 years' imprisonment. 730 ILCS 5/5—8—1(a)(1)(a) (West 1994). Section 5—8—1(a)(1)(b) allows the judge the discretion to impose a sentence of natural life imprisonment based upon the judge's finding that defendant's conduct was exceptionally brutal or heinous behavior indicative of wanton cruelty, or that any of the death penalty qualifying factors are present. 730 ILCS 5/5—8—1(a)(1)(b) (West 1994).

At stage two of a death penalty case, the qualifying aggravating factors must be proved beyond a reasonable doubt, and defendant has the right to a jury's determination of the existence of such factors. 720 ILCS 5/9—1(d), (f) (West 1994). In contrast, section 5—8—1(a)(1)(b) makes no provision for the submission of the exceptionally brutal and heinous issue to a jury, nor does it require that the State prove that fact beyond a reasonable doubt at any stage. Here the trial court's finding at the sentencing hearing of exceptionally brutal and heinous behavior indicative of wanton cruelty enhanced the penalty for defendant's offense beyond the statutory maximum of 60 years' imprisonment. Therefore, according to *Apprendi*, this sentencing scheme violates the fourteenth amendment's (U.S. Const., amend. XIV) proscription of the deprivation of liberty without due process of law and the sixth amendment (U.S. Const., amend. VI) right to trial by jury. "If the statute in question increased the penalty range or the maximum penalty for a particular crime, it would seem that the statute would unquestionably be within the scope of *Apprendi*." *People v. Clifton*, 321 Ill. App. 3d 707, 725 (2001). We are required to follow United States Supreme Court precedent where the result therein is mandated by the Constitution of the United States. *People v. Gillespie*, 136 Ill. 2d 496, 502 (1990).

Therefore, we hold that section 5—8—1(a)(1)(b) of the Unified Code of Corrections is unconstitutional under *Apprendi* inasmuch as it allows the imposition of a sentence of natural life imprisonment when the court makes a finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty without affording defendant the right to a jury determination of whether or not the State proved the fact beyond a reasonable doubt. Because defendant was unlawfully sentenced to natural life imprisonment, we exercise our authority under Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)) and reduce defendant's sentence to 60 years' imprisonment, the statutory maximum term for first-degree murder.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of conviction but modify the sentence of natural life imprisonment to 60 years' imprisonment. Our decision renders moot defendant's argument concerning the excessiveness of his sentence.

Affirmed as modified.

GEIGER and COLWELL, JJ., concur.