No. 2--98--1662

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT 

_________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court 

OF ILLINOIS, ) of Lake County. 

)

Plaintiff-Appellee, )

)

v. ) No. 92--CF--2751

)

JUAN A. RIVERA, ) Honorable

) Christopher C. Starck,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

Modified Upon Denial of Rehearing

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

In 1993 a jury convicted defendant, Juan A. Rivera, of the offense of first-degree murder (720 ILCS 5/9--1 (West 1992)).  The trial court imposed a sentence of natural life imprisonment without the possibility of parole.  Defendant appealed, and this court reversed his conviction and remanded the cause for a new trial.  See 
People v. Rivera
, No. 2--94--0075 (November 19, 1996) (unpublished order pursuant to Supreme Court Rule 23).  In October 1998 defendant was retried, and a jury again convicted defendant of the offense of first-degree murder; the trial court sentenced defendant to natural life in prison.  Following the trial court's denial of his posttrial motion, defendant timely appeals.  We affirm.

Eleven-year-old Holly Staker was raped and murdered on August 17, 1992, while she was baby-sitting at Dawn Engelbrecht's home in Waukegan.  Engelbrecht returned home early from her work when she learned her five-year-old son, Blake, had been locked out of her house and that Holly was not answering.  She found her two-year-old daughter, Taylor, on a bed in the children's bedroom and Holly's body on the floor.  Defendant was incarcerated for an unrelated crime sometime after Holly's murder.  An investigation led police to interview defendant, as he had made several statements to another prisoner, Edward Martin, regarding the murder.  Defendant made inculpatory statements to police officers and later provided written statements to the officers.  On November 12, 1992, defendant was indicted for Holly's murder.

In November 1993 defendant was tried and convicted on three counts of first-degree murder, and he was sentenced to life imprisonment without the possibility of parole.  Defendant appealed his conviction and sentence, and this court reversed and remanded for a new trial.  See 
People v. Rivera
, No. 2--94--0075 (November 19, 1996) (unpublished order under Supreme Court Rule 23).  

Prior to retrial, defendant filed a motion to authorize funding to hire an expert witness.  Defendant sought to engage the services of Richard Ofshe, a social psychologist, to present an expert's testimony in the field of false confessions.  In January 1998 the trial court heard arguments on defendant's motion.  The trial court was concerned with the nature and admissibility of the expert's testimony and determined that further inquiry was needed before it would render a decision to authorize the funds.  At a subsequent hearing the trial court reiterated its desire to conduct a 
Frye
 hearing to determine the admissibility of Ofshe's anticipated testimony.  Defendant submitted a memorandum to the trial court concerning evidentiary rules and the 
Frye
 standard and in it questioned whether a 
Frye
 hearing was even necessary under the circumstances of the case.

On February 23, 1998, the trial court conducted an extensive hearing and, on March 2, 1998, determined that false confession evidence of the type proposed by Ofshe would be inadmissible.  The trial court reasoned that the false confession evidence testimony that Ofshe would render added "little or nothing to what [the jurors] can glean from the testimony themselves."  The trial court also noted that, under the 
Frye
 standard, it was not convinced that Ofshe's type of testimony had general acceptance within the psychiatric, psychological, or sociological community.  The trial court ruled that it would not authorize the expenditure of funds and denied defendant's motion.

Trial commenced on September 16, 1998.  The record reflects that the State's case was premised mainly upon circumstantial evidence, as the physical evidence failed to identify any particular suspect.  Edward Martin testified that in mid-September 1992 he had a conversation with defendant while they were both being held in the Lake County jail.  Defendant told Martin that he knew who killed Holly and that he had approached Engelbrecht on her front lawn on the evening of the murder.  Defendant told Martin that the night of the murder he was at a party at the Maurice Craig residence and that another individual kept leaving and returning to the party.  Defendant told Martin that, after approximately 50 minutes, the individual returned to the party but was nervous and had blood on him.  Defendant told Martin that they smoked some marijuana, did some more partying, and then the individual left and hasn't been seen or heard from since.  Defendant also opined that Holly was a tease and that she deserved all 27 stabbings.  Defendant said that neither of Engelbrecht's children had seen anything happen because her son was not there and her daughter was in another room.  Martin relayed to the police that defendant knew who had killed Holly.

Michael Jackson testified that in August 1992 he was living at the Craig residence.  Jackson testified that on August 17, 1992, there was no party at the Craig residence.  Jackson was acquainted with defendant and knew him from the neighborhood.  On October 28, 1992, Jackson went to the Lake County sheriff's office and met defendant in a conference room.  Defendant told Jackson that the officers were trying to "railroad" him and asked Jackson to tell the officers that they were together on the day of Holly's murder.  Jackson responded that he did not want anything to do with the rape and murder of a little girl and would not say what defendant wanted him to say.  Jackson reported his conversation with defendant to the officers.

Alejandro Ontiveros also testified that on August 17, 1992, there was no party at the Craig residence.  Maurice Craig testified that he, his mother, and siblings lived a few blocks from Engelbrecht's residence in August 1992 and that there was no party at his house on August 17, 1992.

Michael Blazincic, an officer with the Lake County sheriff's department, investigated Holly's murder and interviewed defendant.  Defendant told Blazincic that, on the day of Holly's murder, he was at a party at the Craig residence.  Defendant noticed that another individual by the name of Robert had appeared at the party and left several times throughout the course of the party.  Defendant told Blazincic that, after Robert returned to the party the third time, he appeared to be very nervous and had some scratches on his face; Robert told the people at the party that he had fallen.  Thereafter, the people at the party heard police sirens and saw flashing lights.  Defendant stated that he and some others left the Craig residence and went in the direction of where the emergency vehicles were going; Robert went in the opposite direction.  Defendant had not seen him since.

Blazincic and Lieutenant Fernando Shipley of the Waukegan police department confronted defendant with inconsistencies regarding statements he had made to them during the interview.  Defendant admitted to Shipley that he had lied but did not offer a reason.

Officer Donald Meadie of the Waukegan police department and Assistant Commander Chuck Fagan also interviewed defendant regarding his explanations for his whereabouts on the night of Holly's murder.  After approximately 45 minutes, defendant appeared to bow his head and began crying.  Defendant admitted that he was in the house with Holly.  Defendant explained that Holly tried to seduce him; he relented and they had intercourse.  Defendant stopped, though, when Taylor began crying.  Holly wanted to continue and became angry when defendant stopped.  She then threatened defendant with a knife.  Defendant further explained that, in fighting Holly off when he attempted to halt her attack, he ended up with the knife.  Not realizing he had the knife, defendant began punching Holly and she fell to the floor.  Defendant stated that he panicked.  He washed the knife, left the apartment, broke the knife and threw it down, and went home.  At home he took a shower and burned his bloodied clothes.  He returned to the area of the apartment and approached Engelbrecht to find out whether Holly was dead.  Meadie prepared defendant's statement, and defendant made one correction and signed it.

Lieutenant Michael Maley of the Illinois State Police also obtained a statement from defendant.  In that statement, defendant explained that he was unable to achieve an erection because of his earlier ingestion of cocaine and Holly was ridiculing him.  He became angry and retrieved a knife from the kitchen.  Holly struggled with defendant while he was "cutting" her.  Defendant explained that, if she had stopped struggling with him, he would have stopped cutting her and she would not have gotten hurt any further.  Defendant put Holly on the bed.  He then developed an erection, so he engaged in vaginal and anal intercourse upon her.  He washed his hands and the knife in the kitchen and used a towel to wipe any fingerprints on the doorknob.  Defendant also stated that he wanted it to appear like a burglary break-in, so he punched a mop handle through the back door.  Defendant then left the apartment, broke the knife and threw it down, went home, showered, and burned his clothes before returning to the area of the apartment.  Defendant stated that he did not know until the following day that he had killed Holly.

David Ostertag was a detective sergeant for the Round Lake Beach police department and an investigator for the Lake County major crimes task force at the time of Holly's murder.  He sat with defendant while defendant ate lunch during his interview.  Defendant told Ostertag that he was sorry for what he did to Holly and that he did not have to worry about going to prison because he would kill himself first.

The transcribed testimony of Frank McDonald was read to the jury.  McDonald was a witness who testified at defendant's first trial but was unavailable for defendant's retrial.  Prior to the submission of the transcript, the parties edited from it portions of what this court had previously found improper, as well as other portions such as testimony that was stricken by objection.  McDonald's testimony reflected that he and defendant were both prisoners in the Lake County jail from November 1992 to February 1993.  McDonald explained that, while he was serving time, he occupied himself by reading the statutes pertaining to criminal conduct and the discovery packages of fellow inmates.  Defendant asked McDonald to review his discovery materials to uncover information on another possible suspect, Dion Markadonis.  After reviewing the material, McDonald discussed the case with defendant.  Defendant asked McDonald what he thought, and McDonald responded, 
inter alia
, "You're in a lot of trouble.  *** You killed Holly."  McDonald stated that defendant's head "went down and he said, 'Yeah, I did.' "

David Crespo was an inmate at the Lake County jail during the time defendant was awaiting this retrial.  Crespo testified that he and defendant attended a Spanish Bible study meeting together in May 1997.  As they returned to the jail, defendant admitted to Crespo that he had "killed that little girl."  Defendant told Crespo, however, that he would be "taken care of" if he told anyone.  Crespo was initially afraid to tell anyone but later contacted authorities and relayed the statements to them.

Taylor Arena, Engelbrecht's daughter, was approximately 32 months old at the time of Holly's murder and was approximately 8 years old at the time of defendant's retrial.  Taylor testified that she remembered going to the store with Holly to buy a pizza, returning home, cooking the pizza, and eating it.  Blake was playing outside.  Taylor said the man who stabbed Holly came in through the back door and that Holly did not let him in.  Taylor related that the man stabbed Holly three times in her stomach.  They were in the kitchen and he dragged her into the bedroom and put Holly on one of the beds.  The man picked Taylor up and put her on the same bed.  After Taylor finished testifying, the trial was adjourned for the day.

When court resumed the next morning, the State advised the trial court that, after Taylor had finished testifying, she identified defendant as the person who had stabbed Holly.  The State requested leave to recall her, and defense counsel objected.  The trial court conducted a hearing in which all parties questioned Taylor regarding her recollection of defendant and her recent identification of him.  The trial court allowed the State to recall Taylor, and Taylor identified defendant to the jury as the person who had stabbed Holly.  The trial court also authorized the expenditure of $5,000 to the defense for an expert to testify regarding the recalled memory of Taylor.

The State rested, and the defense called Dr. Larry Heinrich, a licensed clinical psychologist, to testify as an expert.  In 1993 Heinrich examined defendant and performed a clinical interview.  Heinrich opined that on October 30, 1992, when defendant admitted to committing the murder, he was "decompensated," that is, he was unable to respond in a manner that would be consistent with a logical, coherent, and integrated manner.  Heinrich explained that, in defendant's case, he was under such stress that in response he would do anything or say anything to escape the stressful situation he was in.  Heinrich estimated that defendant's state of decompensation began when he became emotional during the interview and began crying.

Defense counsel next made an offer of proof with respect to the proposed testimony of Ofshe regarding false confessions.  The trial court recalled that it would not allow funding because it did not find Ofshe's material admissible.

Just prior to the parties' closing arguments, defense counsel informed the trial court that neither of the two expert witnesses that they had wanted to testify regarding the recalled memory of Taylor Arena was available.  Earlier in the trial, the trial court had suggested that defense counsel subpoena the experts.  The trial court reasoned that it would be preferable to subpoena one expert and force him to reschedule two or three patients rather than detain the jurors an extra four or five days.  Defense counsel explained that they did not want to subpoena the experts because they feared the experts would become hostile if faced with that type of proceeding.  Defense counsel requested a continuance to secure the testimony of one of the experts, Dr. Kraus.  The trial court responded that it stood ready to issue a subpoena and a body attachment but it would not continue the case.

The parties presented their closing arguments and the trial court instructed the jury.  The jury retired to deliberate.  During the course of deliberations, the jury communicated with the trial court regarding the verdict forms and the definition of reasonable doubt.  The trial court responded after consulting with the parties.  Deliberations continued into the following day, and the trial court received another note from the foreperson informing the trial court that he believed the jury was at an impasse.  The note read, in pertinent part:

"We have certain members of the jury that believe without physical evidence *** they cannot agree to a guilty verdict beyond a reasonable doubt.

We have a larger number of jurors who believe, beyond a reasonable doubt, that [defendant] is guilty.

At this time the division is strong and we do not see a way to move the parties."

The record reflects that, at some later point but before the trial court responded to the foregoing note, the jurors called the deputy to request transcripts of testimony of 10 witnesses.  The foreperson informed the deputy that, by reviewing the testimony, the jury could expedite its deliberations and reach a verdict yet that day.  Following arguments of the parties, the trial court responded to the jury:

"Daily transcripts of the trial are not prepared.  The testimony you requested would take several days to prepare.  I will not provide those transcripts to you.

Please continue to deliberate."

The jury continued its deliberations into the evening, and at approximately 7 p.m., the parties agreed that the trial court would issue the following instruction to the jury:

"Stop your deliberations.  You will again be sequestered for the evening.  You must not discuss this case in any way with anyone.  ***

Any communications, other than food, housing and comfort matters, must be reduced to writing and tendered to the court.

If there are further communications addressed to the Court, do not include in your written notes any indication as to the number of jurors that would vote one way or another."

Jury deliberations resumed the next day.  At approximately 11 a.m., the jury requested defense exhibits for its review.  After conferring with the parties, the trial court responded and asked the jury which specific defense exhibits it was missing.  At some point later, the jury sent the following note to the trial court:

"As mentioned yesterday, we have an issue of a lack of physical evidence ***.  We have tried to review direct testimony to get past this issue but, have failed.

Quite frankly, continued discussion has only served to escalate a tense situation.  We are not progressing and have not progressed for the past 4-6 hours of deliberation.

We are more than willing to discuss this issue with you, face-to-face, but a simple 'keep deliberating' message is not going to move this jury forward ***."

At approximately 3 p.m., the trial court conducted a hearing in response to the jury's note.  Following arguments of the parties, the trial court decided to instruct the jury pursuant to 
People v. Prim
, 53 Ill. 2d 62 (1972).  The jury was brought into the courtroom; the trial court read the 
Prim
 instruction, and the jury returned to deliberate.  The following evening, the jury found defendant guilty of three counts of the offense of first-degree murder and not guilty of one count of the offense of first-degree murder.

Defendant filed a posttrial motion and the trial court conducted a hearing.  In November 1998 following the arguments of the parties, the trial court denied defendant's posttrial motion and scheduled defendant's sentencing hearing.  On December 10, 1998, the trial court conducted a sentencing hearing.  Defendant also presented a supplemental motion for new trial and asked for a continuance to obtain a report in support of the motion reflecting that Taylor had recanted her identification testimony of defendant.  The State objected to defendant's motion for a continuance and the supplemental motion for new trial.  The trial court heard the arguments of the parties and denied defendant's motion for continuance and then the supplemental motion for new trial.

Proceeding to the sentencing phase, the trial court stated that this was a case of "uncommon savagery and unspeakable brutality."  The trial court continued and reflected upon the factors in aggravation.  It found that defendant had a history of criminal conduct and that sentencing him was necessary to deter others from committing a similar offense.  It further found that the crime was committed during the course of a criminal sexual assault and that the murdered individual was under the age of 12.  The trial court commented that, for those two reasons, defendant was initially eligible for a death sentence.  The trial court found that the offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty and determined that defendant was eligible for extended-term sentencing.  The trial court sentenced defendant for a period of natural life imprisonment without the possibility of parole.  The mittimus reflects that the trial court entered judgment on defendant's conviction of first-degree murder during the course of an aggravated criminal sexual assault.  The trial court denied defendant's motion to reconsider sentence, and defendant timely appeals.

[Nonpublishable material under Supreme Court Rule 23 removed here.]
  

In a supplemental brief, defendant contends that his sentence of natural life imprisonment is void because it fails to comply with the recent Supreme Court ruling announced in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).  The 
Apprendi
 court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  
Apprendi
, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.  We note that, since 
Apprendi
 was decided, our legislature has amended section 5--5--3 of the Unified Code of Corrections (the Code) in response (see 730 ILCS 5/5--5--3(d) (West 2000)).  However, we decline to address the amendment in light of our conclusion that the trial court properly sentenced defendant in accordance with the rule announced in 
Apprendi
.

In the present case, the trial court sentenced defendant pursuant to section 5--8--1 of the  Code (730 ILCS 5/5--8--1 (West 1998)), which provides:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

(a) a term shall be not less than 20 years and not more than 60 years, or

(b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or, except as set forth in subsection (a)(1)(c) of this Section, that any of the aggravating factors listed in subsection (b) of Section 9--1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment[.]"  730 ILCS 5/5--8--1(a), (b) (West 1998).

Aggravating factors listed in section 9--1(b) of the Criminal Code of 1961 (720 ILCS 5/9--1(b) (West 1998)) that allow a trial court the discretion to sentence a defendant to natural life imprisonment include whether the victim was killed in the course of another felony and whether the victim was under the age of 12 and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.  See 720 ILCS 5/9--1(b)(6), (b)(7) (West 1998).

Defendant argues that the determination of whether a crime was accompanied by brutal and heinous behavior indicative of wanton cruelty is a factual finding the trial court used to increase his sentence beyond the statutorily prescribed 60 years.  He further states that the State failed to plead this required factor and submit it to the jury.  Therefore, according to defendant, this factor the trial court used to enhance his sentence beyond 60 years was not proved beyond a reasonable doubt.  Defendant submits that, because the State failed to plead and present this requirement to the jury and because the jury made no finding that the offense committed was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty, the trial court lacked the authority to impose a sentence greater than 60 years.  He therefore  concludes that, based upon the rule announced in 
Apprendi
, his sentence of natural life imprisonment was unconstitutionally imposed
. 

Since 
Apprendi
 was decided, our reviewing courts have examined and reexamined our state's statutory sentencing scheme.  See 
People v. Reed
, 324 Ill. App. 3d 671 (2001); 
People v. Vida
, 323 Ill. App. 3d 554 (2001); 
People v. Nitz
, 319 Ill. App. 3d 949 (2001); 
People v. Joyner
, 317 Ill. App. 3d 93 (2000).  In 
Reed
, 
Nitz
, and 
Joyner
, the reviewing courts held that this particular sentencing scheme was unconstitutional under 
Apprendi
 because it allowed the trial courts to impose extended-term sentences upon their findings that the murders were accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty without affording the defendants the right to a jury determination of whether the State proved that fact beyond a reasonable doubt.  See 
Reed
, 324 Ill. App. 3d at 685; 
Nitz
, 319 Ill. App. 3d at 969; 
Joyner
, 317 Ill. App. 3d at 110.

In 
Vida
, however, the First District offered a different analysis.  In 
Vida
, a jury convicted the defendant of first-degree murder.  At sentencing, the trial court found that the defendant's actions were exceptionally brutal and heinous and indicative of wanton cruelty, and it sentenced the defendant to 100 years' imprisonment.  The reviewing court in 
Vida
 read sections 5--8--1 and 5--8--2 together as part of a single sentencing scheme and noted that the courts in 
Joyner
 and 
Nitz
 appeared to treat the sentencing provisions independently of each other.  
Vida
, 323 Ill. App. 3d at 570.  The court distinguished 
Apprendi
 by noting that, in Illinois, the application of an extended-term statute is determined by the "offense" rather than by the extent or nature of the defendant's participation.  
Vida
, 323 Ill. App. 3d at 572, citing 
People v. Palmer
, 148 Ill. 2d 70, 89 (1992).  In affirming the defendant's conviction and extended-term sentence, the reviewing court found that the trial court considered the evidence regarding the particular offense for which the defendant was tried and properly sentenced the defendant within the range of possible penalties for first-degree murder.  Therefore, no constitutional violation occurred.  
Vida
, 323 Ill. App. 3d at 572-73.

More recent, though, is our supreme court's analysis and disposition of 
People v. Ford
, No. 90083 (October 18, 2001).  In 
Ford
, the defendant was found guilty of first-degree murder (720 ILCS 5/9--1(a)(1) (West 1998)) following a bench trial, and the State sought the imposition of the death penalty.  The defendant waived a jury for both phases of the capital sentencing hearing.  The trial court found that the defendant was eligible for the death penalty but declined to impose it.  Rather, the trial court imposed an extended-term sentence of 100 years based upon its finding that the murder " 'was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.' "  
Ford
, No. 90083, slip op. at 5, quoting 730 ILCS 5/5--5--3.2(b)(2), 5--8--2(a)(1) (West 1998).

The defendant challenged the constitutionality of his sentence, and our supreme court affirmed.  
Ford
, No. 90083, slip op. at 5-12.  The 
Ford
 court noted that the trial court had found beyond a reasonable doubt that the defendant was eligible for the death penalty because the murder was committed in the course of another felony and involved the infliction of torture (720 ILCS 5/9--1(b)(6), (b)(14) (West 1998)).  Based on the trial court's findings, the 
Ford
 court determined that the statutory maximum penalty defendant could receive was that of death and that the sentence the defendant ultimately received--100 years--did not exceed the maximum.  
Ford
, No. 90083, slip op. at 7-8.

The 
Ford
 court rejected the defendant's argument that the aggravating factor the trial court employed to impose his 100-year sentence--that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty--was not proved beyond a reasonable doubt.  The court explained that 
Apprendi
 did not require that 
every
 fact related to sentencing be proved beyond a reasonable doubt but only those facts that increase the penalty for a crime beyond the prescribed statutory maximum must be proved beyond a reasonable doubt.  
Ford
, No. 90083, slip op. at 10.  Therefore, the court concluded, the trial court's finding that the murder the defendant committed was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty did nothing to increase the penalty that the defendant was already facing.  Rather, the 
Ford
 court explained that the trial court's finding was properly used as guidance in determining the defendant's sentence.  
Ford
, No. 90083, slip op. at 11-12.

In the present case, the State declined to seek the death penalty, and the cause proceeded to a jury trial.  Following deliberations, the jury specifically found, 
inter alia
, that defendant had committed first-degree murder during the course of a felony, that is, an aggravated criminal sexual assault (see 720 ILCS 5/9--1(a)(3) (West 1998)).  Pursuant to the principles enunciated in 
Ford
 and based exclusively upon the evidence presented to the jury, defendant was confronted at that point with the possibility that he was eligible to receive a prescribed statutory maximum sentence of natural life imprisonment.  See 730 ILCS 5/5--8--1(b), 720 ILCS 5/9--1(b)(6) (West 1998).

At the sentencing hearing, the trial court stated that it had considered the evidence presented throughout trial; it had also reviewed the presentence investigation report; it considered the arguments of counsel; it considered the victim impact statement; and it considered the statutory and nonstatutory factors in aggravation and mitigation.  The trial court reviewed the history of the case, including the jury's findings of guilt in three different ways--that defendant knew his acts would cause death or great bodily harm to Holly, that the act was committed during the course of an aggravated criminal sexual assault, and that defendant knew his acts created a strong probability of death or great bodily harm.  The trial court noted the applicable mitigating factors.  After also noting the applicable aggravating factors, including that the murdered victim was under the age of 12 years, the trial court determined that defendant was eligible for an extended-term sentence.  The trial court found that the repeated stab wounds and the sexual acts committed upon the victim, a small young individual, reflected that the likelihood of rehabilitation of defendant was virtually nonexistent.  The trial court concluded that the murder of Holly was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty.  Based upon the evidence presented, the trial court determined that defendant should receive the prescribed statutory maximum sentence of natural life imprisonment.

We determine that defendant's sentence of natural life imprisonment was specifically authorized by statute and hold that the trial court's imposition of the sentence complied with the rule announced in 
Apprendi
.  

We recognize that, in 
People v. Joyner
, 317 Ill. App. 3d 93 (2000), this court previously held that section 5--8--1(a)(1)(b)  was unconstitutional as a violation of due process and a defendant's right to a trial by jury.  See also 
People v. Swift
, 322 Ill. App. 3d 127 (2001) (holding the extended-term sentencing provision of section 5--8--2(a) of the Code unconstitutional).  However, upon our reconsideration, and upon our review of our supreme court's analysis in 
Ford
, we now hold otherwise.  A trial court, as the entity vested with the authority to sentence a defendant, should also be vested with the discretion to render upon a defendant a sentence within the range of penalties statutorily provided by our legislature based upon the offense rather than the extent or nature of the defendant's participation as well as the relevant evidence presented by the parties at trial and at sentencing.  Accordingly, we affirm defendant's conviction and sentence.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

BOWMAN and O'MALLEY, JJ., concur.