SIXTH DIVISION

June 22, 2001

No. 1-99-2922

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

DAVID VIDA,

Defendant-Appellant.

)))))))))

Appeal from the

Circuit Court of

Cook County

Honorable

Frank De Boni,

Judge Presiding.

JUSTICE GALLAGHER delivered the opinion of the court:
 

Following a jury trial, defendant David Vida was convicted of first degree murder.  Finding that defendant's actions were exceptionally brutal and heinous and indicative of wanton cruelty, the trial court sentenced him to 100 years in prison.  On appeal, defendant contends that the police lacked probable cause to arrest him.  Defendant also asserts that his trial counsel was ineffective because counsel advised him not to testify at trial and failed to present significant evidence to support his case.  In addition, defendant contends that the court erred in allowing the jury to view statements by defendant's mother during its deliberations.  Defendant also claims that his 100-year prison sentence was excessive, an abuse of the trial court's discretion, and in violation of the United States Supreme Court's opinion in 
Apprendi v. New Jersey
, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000), which held that any fact that increases the sentence for a crime beyond the prescribed statutory maximum for that offense must be submitted to a jury and proved beyond a reasonable doubt.  For the foregoing reasons, we affirm defendant's convictions and sentence.

At a hearing on defendant's motion to quash his arrest and suppress evidence, Larry Lindenman of the Illinois State Police investigations unit was the sole witness.  Lindenman testified that on March 2, 1997, he investigated the discovery of a dismembered male body at a campsite in the Des Plaines conservation area in Will County.  Clad in a bloodstained shirt and jeans, the body had been cut in half at the waist and placed in plastic garbage bags.  The body was later identified as Scott Harast.

Several days before the body was discovered, Harast's parents reported him missing.  Patricia Harast last saw her son alive on February 24 when he and defendant discussed working together to rehab a house.  Harast told Lindenman she was surprised at their plans because defendant and her son had a bad relationship.  

At about 8 p.m. on February 24, a cashier at Leo's Liquors in Brookfield waited on Harast and defendant.  Another cashier at that store told Lindenman that on February 20, she heard defendant call Harast a "faggot" and say that he knew people who could kill him.  Regarding Harast's disappearance, d
efendant said he and Harast had gone to a liquor store and he had proceeded to the jobsite while Harast stopped at a local grocery store.  However, the owner of the grocery store told Lindenman that Harast did not enter the store that night.  
D
efendant said he and Harast were to meet at the house but Harast never arrived. 

Lindenman testified that on March 4, police obtained a search warrant for 3517 South Park Avenue in Brookfield.  In the house, crime scene investigators discovered blood splatters and markings consistent with a body being chopped on the basement floor.  The indentation of a chop mark on the floor contained jean material, human tissue and blood.  Tissue and blood were found on a nail protruding from a hole in the first floor leading to the basement.  
Police recovered a bloody ax and tree saw that Lindenman testified were capable of dismembering a human body.  A bloody sledge hammer and a broken chair also were found.    

Defendant told Brookfield police that he and Harast were good friends and planned to rehab the Park Avenue house.  The house's owner told police that he had hired defendant to perform such work.

L
indenman testified that 3517 South Park Avenue was four or five blocks away from defendant's residence.
  On March 7, Lindenman and Steve Kline, an Illinois State Police detective, went to defendant's home and told defendant they wanted to speak to him at state police headquarters in Lockport.  Defendant agreed to cooperate, and Lindenman told defendant that he could drive separately if he wished.  Defendant said he would go with the officers because his driver's license was suspended.  The officers did not handcuff defendant.  On cross-examination, Lindenman testified that he did not tell defendant that he did not have to go with them to police headquarters.  The trial court denied defendant's motion to quash his arrest and suppress evidence, finding that sufficient probable cause existed for defendant's arrest.  Defendant also made a motion to suppress his statements to police, which the trial court also denied.

At trial, Patricia Harast testified that at the time of his death, her son rented a room at 3424 Grand Boulevard in Brookfield from Julie Killian, who was defendant's sister, and Killian's husband.  She testified that her son was gay.  On February 24, he told her he and defendant were going to a vacant house in Brookfield to do rehab work and that defendant was going to pay him to vacuum.
(footnote: 1)  On cross-examination, she stated that her son was bisexual and that he and Julie Killian were friends and had planned a trip together.  She said her son had a drinking problem and was unemployed and Killian was an alcoholic and a drug addict.     

Kurt Vavra, manager of Leo's Liquors, testified that on February 20, defendant was in the store and that he called Harast a "faggot" and said he wanted to kill him.  Donna Taylor, a cashier at the store, testified that she heard defendant say that day that if Killian died, "they would find that faggot dead somewhere."
(footnote: 2)     

The house's owner testified that on February 22, he asked defendant to obtain a duplicate house key so defendant could enter the house during the week to work in his absence.  On February 28, he found a note on the house's door from defendant apologizing for a broken chair and saying that he would explain later.  Between February 28 and March 2, he entered the house and found that electrical wiring had been pulled out and also noticed a strong odor of cleaning solutions.  Defendant later told the owner that he had accidentally pulled out the wire with his foot and had tripped over the chair and broken it.   

Dr. Larry Blum testified that based on the results of an autopsy, Harast died of skull and brain injuries due to multiple blunt force trauma.  Harast's injuries included two facial fractures, bleeding inside the skull, lungs and trachea, multiple head and body lacerations and fractured ribs, with a total of 20 different injured areas.  Blum testified that the condition of the bones near the dismembered area was consistent with being severed by a saw or a blunt object such as an ax.  Julie Glasner, a state police forensic scientist, testified 
as an expert in DNA analysis and stated that bloodstains on the broken chair and on a mop handle at the scene were consistent with defendant's DNA.

Lindenman testified that after defendant was brought to police headquarters, defendant initially denied killing Harast but later said that he and Harast had argued about Harast's relationship with Killian.  Defendant said Harast swung an ax at him, and defendant punched Harast in the face, causing Harast to fall backward and through a hole in the floor.  After discovering that Harast was not breathing, defendant left.  Defendant denied dismembering Harast's body and leaving it at the campsite.  After offering several other versions of Harast's death, defendant admitted dismembering and disposing of the body and cleaning the basement.  Defendant said he put the body in a van and asked his mother to go with him to drop the body off because that would look less suspicious than if defendant were seen driving alone. 

Cook County Assistant State's Attorney Colin Simpson testified that at about 1 a.m. on March 8, defendant gave a court-reported statement admitting that he killed Harast.  Defendant said he told his mother about the killing and they disposed of the body three days later.  

The defense presented one witness.  Cheryl Vida, defendant's mother, testified that between February 23 and February 27, she was at LaGrange Memorial Hospital recovering from a heart attack.  Vida testified that she did not accompany defendant to dispose of a body.  She gave a statement to Brookfield police at about 5:30 a.m. on March 8; however, she was upset because Killian, her daughter, had just died and did not know what the police said to her.  On cross-examination, Vida denied telling Lindenman that defendant told her that he killed Harast and denied going with defendant to dispose of Harast's body.  However, she admitted signing a statement in Lindenman's presence on March 8. 

In rebuttal, Lindenman testified that he took Vida's statement on March 8.  Vida said that on February 24, defendant told her that he killed Harast and on February 27, she accompanied defendant to the campsite where they left Harast's body.  Lindenman said Vida signed the statement. 

On appeal, defendant first contends that the trial court erred in denying his motion to quash his arrest and suppress evidence.  He argues that Lindenman and Kline arrested him without probable cause when they arrived at his house on March 7 and transported him to state police headquarters.  Defendant points out that Lindenman did not tell him that he did not have to go with them.

To have probable cause to justify a warrantless arrest, a police officer must be aware of facts and circumstances at the time of the arrest that are sufficient to allow a person of reasonable caution to believe that an offense had been committed and that the person being arrested committed the offense.  
People v. Sims
, 192 
Ill. 2d
 592, 614-15, 736 
N.E.2d
 1048, 1060 (2000).  The existence of probable cause is determined by the totality of the circumstances at the time of the arrest.  
Sims
, 192 
Ill. 2d
 at 615, 736 
N.E.2d 
at 1060.  When reviewing a trial court's ruling on a motion to quash an arrest and suppress evidence where no factual or credibility disputes exist, our standard of review is 
de novo
.  
People v. Buss
, 187 
Ill. 2d
 144, 204-05, 718 
N.E.2d 
1, 35 (1999).

Among the factors relevant to establishing probable cause are the proximity of the defendant's residence to the crime scene and whether the defendant was among the last to see the victim alive.  
Buss
, 187 
Ill. 2d
 at 206, 718 
N.E.2d 
at 36. 
 Defendant likens the circumstances surrounding his arrest to those in 
People v. McGhee
, 154 
Ill. App. 3d
 232, 507 
N.E.2d 
33 (1987), which we find distinguishable from the case at bar.  In 
McGhee
, police took a juvenile suspect into custody after learning that the suspect was in the company of the victim on the night before the victim was found dead.  
McGhee
, 154 
Ill. App. 3d
 at 234, 507 
N.E.2d at 34.  This court found that information insufficient to support the suspect's arrest.  
McGhee
, 154 
Ill. App. 3d
 at 237, 507 
N.E.2d 
at 36, quoting 
Wong Sun v. United States
, 371 U.S. 471, 479, 9 L. Ed. 2d 441, 450, 83 S. Ct. 407, 413 (1963) ("'[i]t is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion [citation], though the arresting officer need not have in hand evidence which would suffice to convict'").  

Here, the circumstances that were known to police when they arrested defendant went beyond the fact that defendant was the last person seen with Harast before his death.  Lindenman testified that he had learned that Harast was last seen alive with defendant, that the two men had a bad relationship, and that defendant had threatened to kill Harast and used a derogatory term to describe him.  In addition, defendant lived four or five blocks away from the Park Avenue house, in which investigators found evidence consistent with Harast's injuries.  Defendant also told police he was working on rehabbing the house, which the owner confirmed.
  Based upon the totality of the circumstances known to police, we find that sufficient probable cause existed to arrest defendant. 

Defendant also contends that even if the police had probable cause to arrest him, the arrest was unlawful because it was made inside his house.  Under
 Payton v. New York
, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), entry without a valid warrant into a suspect's residence to effectuate an arrest violates the fourth amendment of the United States Constitution.  U.S. Const., amend. IV; see also 
People v. Wimbley
, 314 
Ill. App. 3d
 18, 731 
N.E.2d 
290 (2000).  At the suppression hearing, Lindenman testified that he and Kline stood on an unenclosed porch at defendant's residence while they spoke to defendant.  Defendant was told he could drive separately if he wished.  
Lindenman testified that defendant agreed to go with the officers and went inside the house to get a coat and to change shoes.  

Based upon those facts, no violation of 
Payton
 occurred because the record does not indicate that defendant was arrested inside his residence.  
Although Lindenman testified that he or Kline entered the residence at some point, no evidence exists that defendant was placed under arrest inside the house or that the officer who entered the house was not invited inside by defendant.  Indeed, as the State points out, the trial judge stated in making his ruling that "I imagine you could say [defendant] was under arrest from the point that he left his house ***."  Even if we were to conclude that the officers placed defendant under arrest on the porch, such an arrest would not violate 
Payton
.  See, 
e.g.
, 
People v. Williams
, 275 
Ill. App. 3d
 249, 254-55, 655 
N.E.2d 
1071, 1076 (1995) (arrest valid on open porch where suspect "was not in an area where he had a reasonable expectation of privacy"); 
People v. Arias
, 179 
Ill. App. 3d
 890, 895-96, 535 
N.E.2d 
89, 92-93 (1989) (officers did not violate 
Payton
 in entering porch because porch was distinct from entry into suspect's home).  Defendant's arguments regarding the lawfulness of his arrest are rejected.

Defendant next contends his trial counsel was ineffective for presenting an inadequate defense consisting only of the testimony of defendant's mother, who had admitted in a written statement to police that she had helped her son dispose of Harast's body.  Defendant also asserts that his defense was hindered by the fact that trial counsel advised him not to testify and that in the absence of his testimony or the presentation of an alibi or affirmative defense, the jury was left to consider only evidence implicating him in Harast's death.
 

To demonstrate ineffective assistance of counsel under 
Strickland v. Washington
, 446 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant such that the result of the proceeding would have been different.  Because a defendant must satisfy both the deficiency and prejudice prongs of 
Strickland
 to state a valid claim of ineffective assistance, failure to establish either component will defeat his or her claim.  
People v. Richardson
, 189 
Ill. 2d
 401, 411, 727 
N.E.2d 
362, 369 (2000). 

Defendant contends that, based upon the advice of counsel, he was 
"forced not to testify in his own defense."  However, the record contains the following exchange between the trial judge and defendant immediately prior to the presentation of defendant's case:

"THE COURT: Mister Vida, as the [d]efendant in this case, you understand you have the right to testify, if you want to.  Do you understand that?

DEFENDANT: Yes.

THE COURT: If you wish to testify, you can take the witness chair, under oath, like all other witnesses and give testimony.  You can also not testify if you want to.  That is your right, not to testify.

DEFENDANT: Yes.

THE COURT: You are under no obligation to offer any testimony.  You shouldn't feel compelled to offer any testimony.  You are presumed innocent.  You may rely on your presumption of innocence.  Do you understand that?

DEFENDANT: Yes.

THE COURT: If you decide, after discussing with [defense counsel] Mister Unger, whether or not you want to testify in this case –

DEFENDANT: What?

THE COURT: Do you wish to testify in your defense?

DEFENDANT: No. 

THE COURT: Okay.  Has anybody forced you or threatened you to make you give up your right to testify?

DEFENDANT: No.

THE COURT: Has anybody promised you anything to give up your right to testify?

DEFENDANT: No.

THE COURT: You are doing this of your own free will?

DEFENDANT: Yes.

THE COURT: You understand, if you wanted to, you would be allow [
sic
] to testify?

DEFENDANT: Yes.

THE COURT: Okay.

MR. UNGER [to defendant]: You did talk, we did talk it over? 

DEFENDANT: I talked to him.

THE COURT: You and Mister Unger discussed it.  He explained to you all about your right to testify.  It is your decision.  And after talking to Mister Unger you don't want to testify?

DEFENDANT: Yes.

THE COURT: Okay.  Let the record reflect the [d]efendant knowingly and voluntarily waived his right to testify in his own defense.  So we will allow Mister Unger to call whatever witnesses he would like to call."

T
he right of a criminal defendant to testify at trial is fundamental, and therefore, unlike the presentation of other witnesses, the defendant's exercise of the right to testify is not a matter of strategy or a tactical decision left to trial counsel.  
People v. Steward
, 295 
Ill. App. 3d
 735, 743, 693 
N.E.2d 
436, 443 (1998).  
A defendant's decision to testify can only be made by the defendant regardless of counsel's advice to the contrary.  
People v. Clemons
, 277 
Ill. App. 3d
 911, 922, 661 
N.E.2d 
476, 483 (1996).  The above colloquy indicates that the trial court fully advised defendant of his right to testify and reiterated that the decision was defendant's choice to make.  Defendant acknowledged that he understood his right to testify but stated that he did not wish to do so. 

In his brief to this court, defendant asserts that at proceedings on his posttrial motion, his counsel (who was not his attorney at trial) informed the court that although trial counsel had advised defendant not to testify, defendant had actually wanted to take the stand.  
However, the judge at defendant's posttrial proceedings also presided over defendant's trial, and the judge recalled his 
admonitions
 to defendant regarding his right to testify.  In light of the record, defendant has not shown that he was prevented from testifying in his own defense.

Regarding defense counsel's decision to present only the testimony of defendant's mother, decisions about which witnesses to call and what evidence to present in a particular case ultimately rest with counsel and have long been viewed as matters of trial strategy for which counsel is generally immune from
 ineffective assistance claims.  See
 Richardson
, 189 
Ill. 2d
 at 414, 727 
N.E.2d 
at 370
; 
People v. York
, 312 
Ill. App. 3d
 434, 
437, 727 
N.E.2d 
674, 677 (2000).  An exception to this rule exists when counsel's chosen trial strategy is so unsound that he or she fails to submit the prosecution's case to any meaningful adversarial testing.  
People v. Reid
, 179 
Ill. 2d
 297, 310, 688 
N.E.2d 
1156, 1162 (1997).
  
Defendant asserts that 
his trial counsel was inadequate for failing to present an "alibi defense or any other affirmative defenses."  A lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, "'applying a heavy measure of deference to counsel's judgments.'"  
People v. Kokoraleis
, 159 
Ill. 2d
 325, 330, 637 
N.E.2d 
1015, 1018 (1994), quoting 
Strickland
, 446 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066
.  Moreover, what investigation is deemed reasonable depends on the informed strategic choices of, as well as the information supplied by, the defendant.  
Kokoraleis
, 159 
Ill. 2d
 at 330, 637 
N.E.2d at 1018
.  Here, defendant's brief is devoid of specific facts that his counsel overlooked or the names of particular witnesses that counsel failed to interview that would have lent support to such defense theories.
  
Cf.
, 
e.g.
, 
People v. Coleman
, 183 
Ill. 2d
 366, 398, 701 
N.E.2d 
1063, 1079 (1998) (failure to interview witnesses may be indicative of deficient representation when witnesses are known to trial counsel and their testimony may be exonerating).  Absent such evidence to show that counsel's performance was deficient, we find no violation of 
Strickland
.  To the extent that defendant's assertion that "the jury was presented with evidence from the prosecution and nothing more" is an argument that counsel failed to engage in adversarial testing of the State's case, we also disagree.  See
 People v. Shatner
, 174 
Ill. 2d
 133, 145-46, 673 
N.E.2d
 258, 263 (1996) (defense counsel was sufficiently adversarial when he engaged in opening and closing arguments, cross-examined the State's witnesses and presented witnesses, including the defendant, on defendant's behalf, and voiced objections throughout trial to adverse evidence). 

Defendant next contends that the trial court erred in allowing the jury to view his mother's statement because the statement was only used to impeach her credibility and was not admitted as substantive evidence.  To review Vida's testimony, she stated she did not accompany defendant to dispose of a body and although she spoke to Brookfield police, she could not recall details of the conversation.  Lindenman rebutted that testimony, stating that Vida signed a statement admitting that defendant told her he killed Harast and that she accompanied defendant to the campsite to leave the body there.  During deliberations, the jury requested Vida's statement.  The trial judge allowed the statement to be published to the jury, stating that doing so would not prejudice defendant's case because Vida had identified the statement in court
 and acknowledged signing it and because its subject matter was described during testimony.

Defendant argues that Vida's statement was not made under oath and that she denied knowledge of its contents.  
The State responds that Vida's statement was not admitted as substantive evidence but was instead introduced to impeach Vida's credibility after she denied that she gave a statement to Lindenman.  The State also points out that the jury was instructed that a witness may be challenged by evidence of a prior inconsistent statement, which the jury should consider only in determining the weight to be given the witness's testimony.  

Generally, an error is waived where a defendant fails to voice a timely objection to the alleged error and fails to include the issue in a posttrial motion.  
People v. Enoch
, 122 
Ill. 2d
 176, 187, 522 
N.E.2d 
1124, 1130 (1988).  According to the record, the trial judge and counsel for both sides conferred regarding the jury's requests to see Vida's statement.  
Although defendant's posttrial motion included his claim of error regarding Vida's statement, the record indicates that defense counsel did not formally object to the publication of Vida's statement to the jury.  Therefore, defendant has forfeited his right to argue on appeal that the trial court erred in allowing the jury to view the statement during its deliberations.

Pursuant to Supreme Court Rule 615(a) (134 
Ill. 2d
 R. 615(a)), a
 reviewing court may override considerations of waiver where plain errors or defects affecting substantial rights are involved.  See also 
People v. Basler
, 193 
Ill. 2d
 545, 549, 740 
N.E.2d 
1, 3 (2000).  However, the plain error doctrine applies only when the evidence is closely balanced or if the alleged error was of such a magnitude as to deny the defendant a fair trial.
  People v. Morgan
, 142 
Ill. 2d
 410, 444-45, 568 
N.E.2d 
755, 766 (1991).  We do not find the evidence in this case to have been closely balanced.  In addition, sufficient limits were placed on the use of Vida's statement by the jury via the trial court's instruction.  See 
People v. Herron
, 218 
Ill. App. 3d
 561, 574-75, 578 
N.E.2d 
1310, 1320 (1991) (trial court properly allowed jury to review prior inconsistent statement when jury was instructed that statement was not to be considered as substantive evidence).  Therefore, on this record, we do not find that plain error occurred.  

Defendant's remaining contentions on appeal involve his 100-year prison sentence.
  Defendant was convicted of first degree murder, which carries a sentence of between 20 and 60 years in prison pursuant to section 5-8-1(a)(1)(a) of the Unified Code of Corrections (the Code) (730 ILCS 5/5-8-1(a)(1)(a) (West 1998)).  Under section 5-8-2(a) of the Code, which provides for extended-term sentencing, the court was allowed to sentence defendant to between 60 and 100 years in prison if the court found the existence of one or more factors in aggravation set forth in section 5-5-3.2(b).  730 ILCS 5/5-8-2(a)(1), 5-5-3.2(b) (West 1998).  One such factor under 5-5-3.2(b) is when "a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."  730 ILCS 5/5-5-3.2(b)(2) (West 1998).  Based upon its finding of that factor in this case, the court sentenced defendant to 100 years in prison.  

Defendant argues that 
Apprendi
 
requires that the factual question of whether Harast's murder was accompanied by exceptionally 
brutal or heinous behavior indicative of wanton cruelty be decided by a jury and proved beyond a reasonable doubt.  He asks this court to find the statutory sentencing scheme outlined above to be unconstitutional under 
Apprendi 
and to vacate his sentence and remand this case to the trial court for resentencing.

In 
Apprendi
, the Supreme Court addressed a New Jersey statute that classified possession of a firearm for an unlawful purpose as a second degree offense punishable by 5 to 10 years in prison.  Another statute, known as New Jersey's "hate crime" law, provided for imprisonment of between 10 and 20 years if the trial judge determined by a preponderance of the evidence that the defendant "'in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'"  
Apprendi
, 
530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351, quoting N.J. Stat. Ann. §2c:44-3(e) (West Supp. 1999-2000).  The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  
Apprendi
, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.  Apprendi had not 
been charged under the hate crime law, but the trial court nevertheless sentenced him to 12 years in prison under that statute based upon evidence that he had fired several shots into the home of a black family because he did not want them living in the predominantly white neighborhood.  
Apprendi
, 530 U.S. at 468-69, 147 L. Ed. 2d at 442. 120 S. Ct. at 2351.   

In the case at bar, the State initially contends that defendant waived his right to challenge his sentence by failing to include the issue in a postsentencing motion.  Because a challenge to the constitutionality of a statute may be raised at any time, we do not consider defendant's arguments waived.  See 
People v. Wright
, 194 
Ill. 2d
 1, 23, 740 
N.E.2d 
755, 766 (2000).
  Regarding the merits of defendant's argument, the State asserts that 
Apprendi
 was not violated because the sentence for first degree murder can range from a minimum of 20 years to a maximum of the death penalty and that defendant's 100-year sentence therefore did not exceed the statutory maximum sentence for that crime.

The first Illinois case to analyze the statutory sentencing scheme in light of 
Apprendi
 was 
People v. Joyner
, 317 
Ill. App. 3d
 93, 739 
N.E.2d 
594 (2000).  In 
Joyner
, a Second District panel of this court found section 5-8-1(a)(1)(b) unconstitutional under 
Apprendi
 because under that provision, a court could sentence a defendant convicted of first degree murder to natural life imprisonment "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."  730 ILCS 5/5-8-1(a)(1)(b) (West 1998); 
Joyner
, 317 
Ill. App. 3d
 at 110, 739 
N.E.2d 
at 606-07.  The
 
court found that the trial court's finding enhanced the penalty for the defendant's offense beyond the statutory maximum of 60 years in prison as set out in section 5-8-1(a)(1)(a).  
Joyner
, 317 
Ill. App. 3d
 at 110, 739 
N.E.2d 
at 606.  Therefore, a jury should have determined whether the defendant's conduct met the "exceptionally brutal or heinous" standard.  
Joyner
, 317 
Ill. App. 3d
 at 110, 739 
N.E.2d 
at 606-07.  The court reduced defendant's sentence to 60 years, which it deemed "the statutory maximum term for first-degree murder."  
Joyner
, 317 
Ill. App. 3d
 at 110, 739 
N.E.2d 
at 607.  

In 
People v. Beachem
, 317 
Ill. App. 3d
 693, 708, 740 
N.E.2d 
389, 399 (2000), this court held that 
Apprendi 
was violated when the trial judge sentenced the defendant to an extended term of 90 years in prison for first degree murder under section 5-8-2(a) based upon an "exceptionally brutal or heinous" finding under section 5-5-3.2(b)(2)
.  The 
Beachem
 court found that 60 years was the "prescribed maximum sentence for first degree murder in this State" and that 
Apprendi
 prevented findings of fact by the trial court that would extend the defendant's sentence.  
Beachem
, 317 
Ill. App. 3d
 at 708, 740 
N.E.2d
 at 399.  See also 
People v. Chanthaloth
, 318 
Ill. App. 3d
 806, 743 
N.E.2d 
1043 (2001); 
People v. Armstrong
, 318 
Ill. App. 3d
 607, 743 
N.E.2d 
215 (2000); 
People v. Lee
, 318 
Ill. App. 3d
 417, 743 
N.E.2d 1019 (2000); 
People 
v. Kaczmarek
, 318 
Ill. App. 3d
 340, 741 
N.E.2d 
1131 (2000).

Recently, 
in 
People v. Nitz
, 319 
Ill. App. 3d
 949, ___ 
N.E.2d 
___ (2001), a defendant was convicted of first degree murder and was sentenced under section 5-8-1(a)(1)(b) to natural life imprisonment based upon a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty.  The court rejected the State's argument that the maximum statutory penalty for first degree murder is the death penalty.  
Nitz
, 319 
Ill. App. 3d
 at 964, ___ 
N.E.2d 
at ___.  The court held that the jury must "determine[] the facts that fix the limit of exposure to punishment," and that the court's finding under section 5-8-1(a)(1)(b) exposed the defendant to a punishment greater than that authorized by the jury's guilty verdict.  
Nitz
, 319 
Ill. App. 3d
 at 969, ___ 
N.E.2d 
 at ___.  The court modified the defendant's sentence to a 60-year prison term.  
Nitz
, 319 
Ill. App. 3d
 at 969, ___ 
N.E.2d 
at ___.       

The 
Nitz
 court noted that in deciding 
Apprendi
, the Court expressly relied upon its ruling in 
Jones v. United States
, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), which involved a federal carjacking statute that carried a maximum penalty of 15 years in prison for that offense.  The statute in
 Jones
 
also provided that if serious bodily injury occurred during the carjacking, the offender could be sentenced to up to 25 years, and if death occurred, the offender was subject to life imprisonment. 
 Jones
, 526 U.S. at 230, 143 L. Ed. 2d at 318, 119 S. Ct. at 1218.  The Court in 
Jones 
held that the carjacking statute established three distinct criminal offenses and noted that the longer sentences were conditioned on "further facts (injury, death) that seem quite as important as the elements in the principal paragraph (
e.g.
, force and violence, intimidation)."
  Jones
, 526 U.S. at 233, 143 L. Ed. 2d at 319, 119 S. Ct. at 1219.  The Court held that the elements of each separate offense "must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict."  
Jones
, 526 U.S. at 252, 143 L. Ed. 2d at 331, 119 S. Ct. at 1228.         

Noting the Court's reliance in 
Apprendi
 on its previous statement in 
Jones
 that a legislature cannot "remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed," the 
Nitz 
court stated that "the confirmation and endorsement of 
Jones
 by the 
Apprendi
 majority enlightens the central premise of the constitutional rule – it is wrong to convict someone of one crime and sentence [him] for another."  
Nitz
, 319 
Ill. App. 3d
 at 967, ___ 
N.E.2d 
at ___.  The 
Nitz
 court concluded that the trial judge made a factual finding that increased the range of penalties to which the defendant was exposed and which "set [the defendant's] crime apart from other first-degree murders and increased his exposure to punishment."  
Nitz
, 319 
Ill. App. 3d
 at 967, ___ 
N.E.2d 
at ___.  See also
 
People v.
 Rush
, No. 5-99-0092 (May 11, 2001) (following analysis set forth in 
Nitz
).   

Having considered those cases, we set forth a different analysis.  In order to determine whether defendant's sentence exceeded the "prescribed statutory maximum" as stated in 
Apprendi
, 
our first task is to consider the maximum possible sentence that defendant could have received for first degree murder.  Under section 5-8-1(a)(1)(a), the sentence for first degree murder is between 20 and 60 years in prison.  Pursuant to section 5-8-2(a), the trial court can impose a extended-term sentence of 60 to 100 years when the court finds the existence of an aggravating factor in section 5-5-3.2(b).  That occurred in this case with the trial court's finding of exceptionally brutal and heinous behavior indicative of wanton cruelty.  In addition, a sentence of natural life imprisonment was also possible in defendant's case under section 5-8-1(a)(1)(b) based upon the court's finding of exceptionally brutal or heinous behavior indicative of wanton cruelty or any of the aggravating factors found in the death penalty statute.  Defendant could have received the death penalty only upon a jury finding, beyond a reasonable doubt, of the existence of at least one statutory aggravating factor.  See 720 ILCS 5/9-1(b), (f), (g) (West 1998).  Such a finding of eligibility for the death penalty was not made in this case.  Therefore, in this case, the maximum sentence that defendant could have received was natural life imprisonment.

Several panels of this court have agreed on a "maximum sentence" for first degree murder that differs from our assessment.  See
 Nitz
, 319 
Ill. App. 3d
 at 968, ___ 
N.E.2d 
at ___ ("[a] 60-year prison term is the maximum sentence prescribed by law for those facts that define the crime of first degree murder");
 Armstrong
, 318 
Ill. App. 3d
 at 620, 743 
N.E.2d 
at 225 (defendant's sentence "cannot be extended beyond the statutory limitations of 60 years in the instant case");
 Beachem
, 317 
Ill. App. 3d
 at 708, 740 
N.E.2d 
at 399 ("[w]e view 60 years as the prescribed maximum sentence for first-degree murder in this State"); 
Joyner
, 317 
Ill. App. 3d
 at 110, 739 
N.E.2d 
at 606 (the trial court's finding of exceptionally brutal or heinous behavior indicative of wanton cruelty "enhanced the penalty for defendant's offense beyond the statutory maximum of 60 years' imprisonment").
  Those cases make reasonable attempts to reconcile the Illinois sentencing scheme for that offense with the Supreme Court's decision in 
Apprendi
.  However, those cases employ reasoning that is somewhat circular by concluding that the extended-term sentencing provisions violate 
Apprendi
 and that therefore the maximum allowable sentence for first degree murder is 20 to 60 years as provided in section 5-8-1(a)(1)(a).  That view does not acknowledge that the overall sentencing scheme allows for a higher maximum sentence for murder in certain circumstances.  

As opposed to reading sections 5-8-1 and 5-8-2 together as part of a single sentencing scheme, those cases 
treat each sentencing provision as discrete and independent.
  In examining a statute, it must be read as a whole and all relevant parts should be considered, as it is incorrect for a court to construe a statute in such a way as to render any part meaningless or void.  
People v. Reed
, 177 
Ill. 2d
 389, 393, 686 
N.E.2d 
584, 585 (1997)
; 
People v.
 Tarlton
, 91 
Ill. 2d
 1, 5, 434 
N.E.2d 
1110, 1111 (1982).
  It is the responsibility of this court to interpret and apply statutes in the manner in which they are written and not to ignore the clear provisions of a statute.  See 
People v.
 Robinson
, 172 
Ill. 2d
 452, 462, 667 
N.E.2d 
1305, 1309 (1996).  In keeping with that charge, a court must avoid construing a statute in a way that renders any part of it superfluous or meaningless.  
In re Detention of Anders
, 304 
Ill. App. 3d
 117, 121, 710 
N.E.2d 
475, 478 (1999).

In the sentencing scheme at issue, section 5-8-2(a) provides that "[a] judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5-8-1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5-5-3.2 were found to be present."  730 ILCS 5/5-8-2(a) (West 1998).  In arguing that 60 years is the maximum sentence, 
Nitz
 and the cases discussed above ack
nowledge section 5-8-1(a)(1)(a) but do not consider the sentencing scheme in its entirety, specifically the provisions of section 5-8-2(a), which expressly mentions section 5-8-1, and also section 5-8-1(a)(1)(b), which provides for a possible sentence of natural life imprisonment.  By concluding that 60 years is the maximum penalty, these decisions artificially sever section 5-8-1(a)(1)(a) from section 5-8-1(a)(1)(b) and section 5-8-2(a).  These statutes, however, must be read 
in pari materia 
as part of an overall statutory sentencing scheme for murder.  The interpretation of these provisions cannot end with section 5-8-1(a)(1)(a), but must encompass each portion of the legislature's scheme.  

This approach to statutory interpretation under 
Apprendi
 was recently endorsed in 
People v.
 Murphy
, No. 5-99-0535 (May 22, 2001).  In 
Murphy
, another district of this court addressed 
Apprendi 
arguments involving consecutive sentencing under sections 5-8-4(a) and 5-8-4(b) of the Code.  In interpreting 
Apprendi
's holding that sentencing courts must impose judgment "within the range prescribed by statute," the 
Murphy
 court read the term "statute" to "necessarily include the 
entire statutory scheme
 within which a defendant may be sentenced."  (Emphasis added.)
  Murphy
, slip op. at 14-15.    

W
e wholeheartedly agree with the principle adhered to in 
Apprendi,
 
Jones
 and their progeny that a 
defendant should not be charged with and tried for one offense and then sentenced for another.  However, fundamental differences exist between the statutes in 
Apprendi
, 
Jones
 and their progeny and the Illinois sentencing scheme for first degree murder.
  Such differences remain essential to our analysis.  See 
People v. Sutherland
, 317 
Ill. App. 3d
 1117, 1131, 743 
N.E.2d 
1007, 1018 (2000).
(footnote: 3)  

In 
Apprendi
, the defendant was convicted of a "second-degree" offense of possession of a firearm for an unlawful purpose.  However, after the trial judge accepted the defendant's plea of guilty for that offense, the judge held an evidentiary hearing to determine the defendant's "purpose" and proceeded to convict defendant because his crime was motivated by "racial bias."  
Apprendi
, 
530 U.S. at 470-71, 147 L. Ed. 2d at 443, 120 S. Ct. at 2352. 
 In 
Jones
, the defendant was charged with taking a motor vehicle "from the person or presence of another person by force and violence or by intimidation" while possessing a firearm, which carried a possible 15-year sentence.  However, the federal district court sentenced the defendant to 25 years because according to the presentence report, one of the victims of the carjacking sustained serious bodily injury (specifically, a perforated eardrum which resulted in "some numbness and permanent hearing loss").
  Jones
, 526 U.S. at 231, 143 L. Ed. 2d at 318, 119 S. Ct. at 1218.  
The portion of the statute that defined the carjacking offense, with which the defendant was charged, did not contain as an element of the offense that a victim be injured.  In sentencing the defendant, the 
Jones
 court therefore 
considered evidence of a separate offense (
i.e.
, battery or assault with a deadly weapon, to name two hypothetical possibilities) to increase the defendant's sentence beyond the sentence that the defendant would have received for the carjacking alone.  

We agree that those determinations in 
Apprendi
 and 
Jones
 should have been made by a jury.  However, those factual findings differ from that made by the court in this case.  As our supreme court has noted, the application of an extended-term statute is determined by the "offense" rather than by the extent or nature of the defendant's participation.  
People v.
 Palmer
, 
148 
Ill. 2d
 70, 89, 592 
N.E.2d 
940, 948 (1992).  Here, the jury convicted defendant of first degree murder and the court sentenced defendant to an extended term based upon the evidence that was presented at trial regarding that crime, specifically whether the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.
  The statute that the court used to impose an extended-term sentence upon defendant involved a consideration of the evidence regarding the particular offense in question.  The court did not engage in an independent determination of defendant's mental state (as in 
Apprendi
) or consider evidence of additional or more serious crimes that defendant may have committed for which he was not originally charged (as in 
Jones
).  
  

The sentencing statutes at issue properly charge the trial judge with making discretionary findings based upon the nature of the offense.  The Court in 
Apprendi 
goes to great lengths to acknowledge the validity of this practice, stating that judges have long exercised such discretion to sentence a defendant within statutory limits.  
Apprendi
, 
530 U.S. at 481-83, 147 L. Ed. 2d at 449-50, 120 S. Ct. at 2358-59 (noting its observation in 
Williams v. New York
, 337 U.S. 241, 246, 93 L. Ed. 1337, 1341, 69 S. Ct. 1079, 1082 (1949), that a sentencing judge "could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law").  The reading of 
Apprendi 
that this court has so far adopted strips a judge presiding over a murder trial of the benefit of a breadth of experience in trying criminal cases and in applying sentencing factors such as the one used here.  It has eliminated the trial court's discretion that is replete in the statutes that address the possible sentences for murder.  If a jury is to assume responsibility for determining whether a defendant engaged in exceptionally brutal or heinous behavior indicative of wanton cruelty in committing a murder – a standard that is subject to inconsistent interpretations by varying juries – this court and our supreme court must prepare themselves for a plethora of legal challenges to those findings. 

Here, defendant was sentenced under the range of possible penalties for first degree murder after being charged with and tried on the elements of that offense.  Defendant cannot contend that he did not know what punishment he was subject to under the Illinois sentencing scheme for first degree murder, a valid concern that was the linchpin of 
Apprendi
 and, indeed, of the Illinois cases that have attempted to apply 
Apprendi
.  We conclude therefore that no violation of defendant's due process rights occurred.  

Lastly, we turn to 
defendant's remaining contentions regarding his sentence, namely, that the court failed to consider his rehabilitative potential and lack of criminal history and that his sentence therefore must be reduced.  A trial court is vested with wide discretion in imposing a sentence, and if the sentence is within statutory limits, a reviewing court will not disturb it absent an abuse of that discretion.  
People v. Kyles
, 303 
Ill. App. 3d
 338, 354, 708 
N.E.2d 
391, 402 (1998).  
Before sentencing defendant, the court stated that it considered the evidence presented in aggravation and mitigation.
  Contrary to defendant's assertion that he lacked a criminal history, the court heard evidence at sentencing of defendant's criminal record, which included a guilty plea to a battery charge and an arrest for driving under the influence.
  The trial court did not abuse its discretion in sentencing defendant to 100 years for first degree murder, a sentence that we again note was within the statutory limits for that offense.  

Accordingly, defendant's convictions and sentence are affirmed.  As part of our judgment, we grant the State's request to assess defendant $100 as costs for this appeal. 

Affirmed.

BUCKLEY and O'BRIEN, JJ., concur.

FOOTNOTES
1: The remainder of Patricia Harast's testimony was consistent with Lindenman's account at the hearing on defendant's motion to quash his arrest and suppress evidence.  

2: 
As later testimony would establish, Killian died on March 8, 1997, at about the same time police were questioning defendant in connection with Harast's death.  
 

3: 
We note our supreme court's recent decision in 
People v.
 Wagener
, No. 88843 (June 1, 2001), which is its first interpretation of 
Apprendi
.  In 
Wagener
, the supreme court upheld the constitutionality of section 5-8-4(b) of the Code (730 ILCS 5/5-8-4(b) (West 1994)), which allows the 
trial court to impose consecutive sentences if it determines based upon "the nature and circumstances of the offense and the history and character of the defendant" that consecutive sentences are "required to protect the public from further criminal conduct by the defendant ***."  
Wagener
, No. 88843, slip op. at 10.  Recognizing that the United States Supreme Court in 
Apprendi 
had explicitly excluded consecutive sentencing from its analysis, the court reiterated its previous holding that 
consecutive sentences are discrete and separate.  
Wagener
, No. 88843, slip op. at 15.  Stating that 
Apprendi 
only addressed the issue of sentencing for individual crimes, as opposed to a scheme of consecutive sentencing, the court observed:  "[W]e are not bound to extend the decisions of the court to arenas which it did not purport to address ***."  
Wagener
, No. 88842, slip op. at 15-16.