FIRST DIVISION

March 29, 2002

No. 1-98-1326

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County

)

v. ) )

FRANCISCO MENA, ) Honorable

) Ralph Reyna,

Defendant-Appellant. ) Judge Presiding

JUSTICE McNULTY delivered the opinion of the court:

A jury found defendant, Francisco Mena, guilty of first degree murder.  The trial court found that defendant committed the murder with exceptional brutality and on that basis the court imposed an extended-term sentence.  On appeal defendant contends that the trial court erred by refusing to instruct the jury on second degree murder and prosecutorial misconduct deprived him of a fair trial.  We reject both arguments and affirm the conviction.  Defendant also challenges the extended-term sentence because the court based it on a factual finding on an issue never submitted for jury determination.  We agree and therefore we modify the sentence.

Around 3 a.m. on June 22, 1996, police officers arrived at the scene of a car collision.  Gilberto Arteaga and Santos Chavez stood outside of Arteaga's car.  Arteaga's car sustained major damage to its front end, especially on the driver's side.  About 300 feet away another car with major damage had come to rest at the side of the street.  Police found the car's owner, Hector Saldana, face down outside the passenger side of the car, with blood all around his head.  He had died from multiple blunt force injuries.

By a fence near the crash site, police found a jack covered in blood.  A forensic examiner found that the pattern of marks on Saldana's body appeared to match the pattern of ratchets on the jack.

An hour after the police arrived, Freddie Ayala and defendant came to the scene of the collision.  An officer noticed that Ayala's shoes had spots that looked like blood, and defendant's shoes looked wet.  Based on information gathered from others at the scene, an officer arrested Ayala and defendant.  Another officer later remembered that he had seen defendant riding in Arteaga's car around 1 a.m. that night, two hours before the collision.

After 6:30 p.m. that day, about 14 hours after the arrest, defendant gave a statement recorded by a court reporter.  Defendant said that on June 21, 1996, around 5 p.m., he went cruising with Arteaga, a fellow member of the Latin Kings.  They picked up Ayala.  While Arteaga drove on a local street, another car rammed the back of Arteaga's car.  The occupants of the other car flashed signs indicating membership in the Two-Six gang, rivals of the Latin Kings.  The collision flattened Arteaga's rear tire.  Arteaga drove on it to a nearby alley.

According to the court-reported statement, Santos Chavez then joined defendant, Arteaga and Ayala.  After they changed the tire, the four of them got in the car and went out looking for a Two-Sixer's car to ram.  They saw such a car and chased it.  It led them to a street where they saw many other Two-Sixers.  Arteaga quickly turned his car and headed back east, towards Latin Kings territory.  He saw a car following his.  

Defendant said that Arteaga made a U-turn and headed west.  The eastbound car that had followed them then crossed the center line and hit Arteaga's car, causing extensive damage.  Defendant and Ayala jumped out of the car.  Defendant told Arteaga to open the trunk.  Defendant took a jack from the trunk and ran with Ayala to the other car, where they found Saldana lying in the front seat.  Defendant said, "[M]otherfucker, what you doing?"  When Saldana did not respond defendant struck him with the jack.  Saldana still made no response.  Defendant pulled him from the car and threw him on the ground.  Defendant struck Saldana's head twice with the jack, and Ayala jumped on Saldana.  According to defendant's statement, they attacked Saldana because he had wrecked Arteaga's car.

Defendant ran off and washed the blood off his clothes as well as he could.  He went home and changed clothes, then threw his clothes in a trash can in a nearby alley.  He then went over to Ayala's apartment.  They returned to the collision site to check on Arteaga and Chavez.

Although defendant had no complaints about police treatment, he said he had not had any sleep the prior night.  Because he worked on June 21 before meeting Arteaga, he had not slept in 36 hours.  Police did not find defendant's clothes in the trash can where he said he threw them.  

A grand jury indicted defendant for first degree murder.  The charging instrument does not mention any facts that might warrant a death sentence or an extended-term sentence.  The indictment does not charge defendant with exceptionally brutal and heinous conduct indicative of wanton cruelty.

At trial the prosecution first presented Saldana's sister, who testified that Saldana was 18 and working as a deliveryman since he moved from Mexico about a year before his death.  Although the testimony had established the length of time Saldana lived in Chicago, the questioning continued:

Q.  Do you remember when it was that Hector came from Mexico?

A.  He came back a day after my mother passed away, June 20th of '95.

Q.  Did he come for the funeral?

A.  Yes.

Q.  After the funeral, is that when he decided to stay here?

A. Yes, he did."

The medical examiner found two large injuries to the back of Saldana's head.  Each blow fractured the skull.  Seven or eight back injuries showed the pattern of the jack.  Extensive hemorrhaging under the scalp showed that Saldana was alive when the jack struck his head.  Beneath the brain, the bottom of the skull also had been fractured.  The medical examiner said that fracture proved massive force had been used.  The injuries were not consistent with injuries caused by car accidents.

The trial court refused defendant's proposed instruction on second degree murder.

At the beginning of the closing argument, the prosecutor stressed the loss society suffered from Saldana's murder, "[b]ecause of the insanity that has been brought about by street gangs."  After discussing the evidence, the prosecutor invited the jury to tell gangs the streets "don't belong to the gangs."  The jurors had "a phenomenal opportunity to send that message."

The defense emphasized the lack of physical evidence tying defendant to the crime scene and defendant's sleepless state when he made the court-reported confession.

In rebuttal the prosecution returned to the subject of gangs:

"[Defendant] chose to be a Latin King.  And, ladies and gentlemen, let's not make any mistake about it.  We are not asking you to convict him because he is a Latin King gang member.  We are asking you to convict him because he is a cold-blooded murderer."

The prosecutor described the scene:

"Saldana is lying on the ground, choking on his last breath of life, drowning in his blood."

Later, he added:

"You know, it's amazing they never mention the rights of Hector Saldana.  What about his rights?  There was no one there to protect Hector's rights.  This guy behind me was his judge, his jury, and his executioner.

* * *

Counsel mentions our burden of proof in his argument.  It is as if he expects [us] to cower under our table.

Well, ladies and gentlemen, that is our burden of proof, proof beyond a reasonable doubt.  We embrace that burden.  We welcome that burden.

Remember, it is proof beyond a reasonable doubt.  It is not proof beyond all doubt.  It is not proof beyond a shadow of a doubt.  It is proof beyond a reasonable doubt.  It is the same burden that juries in this building and juries across this country use to convict the likes of [defendant].

* * *

Hector's sister was the very first person that you heard from during the course of this trial.

Thanks to [defendant], Hector will be forever 18 in [his family's] hearts and their mind[s]."

The jury found defendant guilty of first degree murder.  Because the judge found the murder brutal and heinous, he sentenced defendant to an extended term of 90 years in prison.

Defense counsel failed to file an appellate brief.  We dismissed the appeal for want of prosecution.  Many months later defendant contacted a court clerk, seeking information about his appeal.  The clerk told him the court dismissed the appeal for want of prosecution.  Defendant filed a petition for post-conviction relief.  The trial court dismissed the petition and defendant appealed.  Defendant later moved this court to vacate the dismissal of the direct appeal.  We granted the motion.  We dispose of the appeal from denial of the postconviction petition by separate opinion.  Here, we address the reinstated direct appeal.

I

 Defendant argues first that the court committed reversible error by denying his request for an instruction on second degree murder.

"Whether to tender a jury instruction on voluntary manslaughter is within the discretion of the trial court. [Citation.]  This discretion, however, is controlled by clear guidelines from this court.  If there is evidence in the record that, if believed by the jury, would reduce a crime from murder to manslaughter, a defendant's request for a manslaughter  instruction must be granted. [Citations.]  Defendant has the burden of proving there is at least 'some evidence' of serious provocation or the trial court may deny the instruction.  

* * *

*** [T]he provocation must be proportionate to the manner in which the accused retaliated.  The crime is murder when a defendant attacks a victim with violence out of all proportion to the provocation.  This is especially true if the homicide is committed with a deadly weapon."  
People v. Austin
, 133 Ill. 2d 118, 124-27, 549 N.E.2d 331 (1989).

Here, the prosecution presented some evidence of serious provocation: according to defendant's statement, which constituted the principal evidence against him, Saldana chased Arteaga and drove across the center line to ram the front of Arteaga's car.  The photographs of the scene show the result of a very forceful collision in which Arteaga's passengers, including defendant, faced serious danger.

Defendant said that in response he grabbed a jack and ran to Saldana's car, where he found Saldana lying, unresponsive, across the front seat.  He dragged him from the car and bashed his head with such force that he fractured the base of Saldana's skull.  Then defendant bashed Saldana's head again.

Although the provocation here cannot be considered slight, the response to the provocation is disproportionate, especially because Saldana lay injured and unresponsive before defendant began hitting him.  We cannot say that the trial judge abused his discretion by denying the second degree murder instruction.

II

Next, defendant claims that prosecutorial misconduct deprived him of a fair trial.  He admits that he waived the issue by failing to object to the misconduct at trial, but he asks the court to review the issue for plain error.  Under the plain error exception to the waiver doctrine, this court conducts a limited review of the record to determine whether the evidence was closely balanced or the errors were of such magnitude that they deprived the defendant of a fundamentally fair trial.  
People v. Mitchell
, 155 Ill. 2d 344, 354, 614 N.E.2d 1213 (1993).

While the prosecution has presented less than overwhelming evidence of defendant's guilt, we cannot characterize the evidence as closely balanced.  An officer saw defendant in Arteaga's car two hours before the assault, and defendant arrived at the crime scene about one hour after police arrived.  Defendant's confession explains both of these facts and fits well with the evidence at the crime scene.  We note that the confession provided police no new information, apart from the means of disposing of the bloody clothes, and police did not find the clothes in the place described in the confession.  But the court-reported confession shows that defendant narrated most of his responses to open-ended questions.  The transcript does not show any special prompting of the answers, just as it does not show the interrogation process over the 14 hours defendant spent in custody leading up his confession.  In light of the consistency of the credible confession with all of the other evidence presented, we hold that the evidence is not closely balanced.

Thus, we review the alleged errors only under the second prong of the plain error rule.  Even when a defendant has waived objections, this court must remedy error when necessary to preserve the integrity of legal proceedings.  
People v. Vargas
, 174 Ill. 2d 355, 363, 673 N.E.2d 1037 (1996).  "A reviewing court will grant relief under the second prong of the plain error rule only if the error is so fundamental to the integrity of the judicial process that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error."  
Vargas
, 174 Ill. 2d at 363-64.

Defendant argues that prosecutors engaged in three separate kinds of misconduct.  They improperly dwelt on the sufferings of Saldana and his family, they appealed to jurors' fears of street gangs, and they minimized the burden of proof.

On direct examination of Saldana's sister, the prosecutor asked for more specific information about Saldana's move to Chicago about a year before the murder.  The objectionable question elicited the irrelevant and provocative testimony that Saldana's mother had died about one year before Saldana died.  See 
People v. Blue
, 189 Ill. 2d 99, 129, 724 N.E.2d 920 (2000).  But a sustained objection to the question would have prevented the elicitation of the prejudicial testimony and the prosecutor's two further references to the funeral of Saldana's mother.

A sustained objection also could have alleviated prejudice from improper comments in closing regarding the sufferings and memories of Saldana's family.  See 
People v. Childress
, 158 Ill. 2d 275, 298, 633 N.E.2d 635 (1994).  Comments on the victim's rights, similar to those at issue here, did not mandate reversal in 
People v. Smith
, 152 Ill. 2d 229, 268-69, 604 N.E.2d 858 (1992).  No evidence supported the prosecutor's argument that Saldana drowned in his own blood.  But the exceptionally violent beating, fracturing both the top and the base of Saldana's skull with a blow struck while Saldana was alive, lends itself to descriptions yet more lurid that the description the prosecutor posed.  The remark about drowning is not likely to have been a material factor in the conviction.  See 
People v. Doran
, 256 Ill. App. 3d  131, 137, 628 N.E.2d 260 (1993).  The improper remarks about the sufferings of Saldana and his family do not amount to plain error.

The prosecutor began closing argument by decrying "the insanity *** brought about by street gangs."  He later pled for the jury to send a message to the gangs.  The prosecutor also listed the wrong choices defendant made, starting with his choice to join a gang.  Defendant argues that these remarks deprived him of a fair trial, just as the remarks in 
People v. Fluker
, 318 Ill. App. 3d 193, 742 N.E.2d 799 (2000), deprived that defendant of a fair trial.  We disagree.

The case for the prosecution in 
Fluker
 rested on the out-of-court identifications of the defendant as the offender by two eyewitnesses.  Both of the witnesses retracted the identifications at trial.  The prosecutor, choosing to mislead the jurors, said:

"The only issue in this case is not is this a mistaken identity * * *.  The only issue is who do you want to control our criminal justice system?  ***

 ***

*** Do you want * * * the Four Corner Hustlers to control our society?"  
Fluker
, 318 Ill. App. 3d at 203.

The trial court compounded the error by overruling prompt, appropriate objections.

The prosecutor here did not substitute any improper, irrelevant issue for the issue properly before the jury.  The comments on gangs here were also less pervasive than the comments in 
Fluker
.  The comments here resemble the comments in 
People v. Morgan
, 306 Ill. App. 3d 616, 632-33, 713 N.E.2d 1203 (1999), more closely than the comments in 
Fluker
.  In 
Morgan
, the appellate court held that the trial court cured prejudice from remarks on gangs by sustaining the defendant's prompt objections.  We cannot say that the comments on gangs here deprived defendant of a fundamentally fair trial.

Defendant also objects to the prosecutor's comments on the burden of proof.  The prosecutor made light of defense counsel's emphasis on the burden, saying that he would not "cower under [the] table."  The prosecutor then attempted to define the burden of proof beyond a reasonable doubt, arguing that the prosecution need not prove guilt beyond all doubt and that juries across the country find evidence in other cases sufficient to meet the burden.  The appellate court has repeatedly held similar arguments improper.  See 
People v. Jones
, 241 Ill. App. 3d 228, 234, 608 N.E.2d 953 (1993); 
People v. Frazier
, 107 Ill. App. 3d 1096, 1102, 438 N.E.2d 623 (1982); 
People v. Martinez
, 76 Ill. App. 3d 280, 285, 395 N.E.2d 86 (1979).  However, the appellate court has also held that by sustaining objections and properly instructing the jury, the trial court can ameliorate the prejudicial effect of such remarks.  
People v. Wielgos
, 220 Ill. App. 3d 812, 820-21, 581 N.E.2d 298 (1991).  Again, we cannot say that the improper comments on the burden of proof deprived defendant of a fundamentally fair trial.

Even considering the closing argument as a whole, we cannot say that the comments "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process."  
People v. Albanese
, 104 Ill. 2d 504, 518, 473 N.E.2d 1246 (1984).  Accordingly, we affirm the conviction for first degree murder.

III

After the jury found defendant guilty of first degree murder, the trial court, at sentencing, found that defendant committed the murder in an exceptionally brutal and heinous manner indicative of wanton cruelty.  Based on that finding, the court sentenced defendant to an extended term of 90 years in prison, pursuant to sections 5-5-3.2 and 5-8-2 of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(b)(2), 5/5-8-2 (a)(1) (West 1996)).

The appellate court has repeatedly held that the statutory scheme for extended-term sentences denies defendants due process, because the statute permits the court to sentence a defendant to a term in excess of the maximum permitted by statute for the charge submitted to the jury, based on a finding of fact never submitted for jury determination.  
E.g.
, 
People v. Nitz
, 319 Ill. App. 3d 949, 962-69, 747 N.E.2d 38 (2001); 
People v. Swift
, 322 Ill. App. 3d 127, 129-31, 750 N.E.2d 294 (2001); 
People v. Reynolds
, No. 1-00-0747 (February 8, 2002); 
People v. Johnson
, No. 5-99-0637 (October 23, 2001).  As the court explained in 
Nitz
:

"When we examine the machinery for the imposition of a life sentence, we need to ask:  What was the most severe punishment the law allowed the trial judge to impose, absent his finding that [the defendant] killed [the victim] in a brutal and heinous manner indicative of wanton cruelty?  *** '[D]oes the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?'"  
People v. Nitz
, 319 Ill. App. 3d at 968, quoting 
Apprendi v. New Jersey
, 530 U.S. 466, 494, 147 L. Ed. 2d 435, 457 120 S. Ct. 2348, 2365, (2000).

Here, as in 
Nitz
 and 
Swift
, the jury's verdict, without any additional finding of fact, authorized the court to sentence defendant to a term of between 20 and 60 years in prison. 730 ILCS 5/5-8-1(a)(1)(a) (West 1996).  The Unified Code of Corrections unconstitutionally deprives the defendant of the right to a jury determination of a fact crucial for setting the range of appropriate sentences the court has the authority to impose.

The prosecution claims that two cases require a contrary result.  In 
People v. Ford
, 198 Ill. 2d 68, 761 N.E.2d 735 (2001), our supreme court affirmed an extended-term sentence imposed on a defendant when the court found the defendant murdered the victim in an exceptionally brutal manner.  But the court explained that the prosecution there sought the death penalty, and the defendant waived his right to a jury for the determination of death eligibility.  At the death penalty hearing, the trial court "found, by proof beyond a reasonable doubt, that defendant was eligible for the death penalty.  At this point, and based exclusively upon facts that were proved beyond a reasonable doubt, defendant faced a prescribed statutory maximum sentence of death."  
People v. Ford
, 198 Ill. 2d 68, 74 (2001).  The court held that the extended term did not exceed this maximum.

The decision in 
Ford
 fully comports with the principles restated in 
Nitz
.  The defendant in 
Ford
 had a right to have a jury determine, beyond a reasonable doubt, all facts necessary to establish the appropriate range of sentences, up to a maximum of the death sentence.  The imposition of a lesser sentence based on the court's finding of exceptional brutality did not violate the constraints of due process.

The prosecution also cites 
People v. Vida
, 323 Ill. App. 3d 554, 572, 752 N.E.2d 614 (2001), which rejected the reasoning of all prior cases addressing the issue.  The court in 
Vida
 held that section 5-8-1(a) of the Unified Code of Corrections, authorizing sentences of 20 to 60 years for first degree murder, does not establish a statutory maximum for any crime, and the finding of exceptional brutality does not qualify as a finding of fact.  
Vida
, 323 Ill. App. 3d at 570-72.  The court concluded that the jury verdict of murder permitted a maximum sentence of natural life in prison, without any separate findings of what that court considered facts.

We adopt the more persuasive reasoning of 
Nitz
:

"While our legislature clearly authorized the imposition of natural-life imprisonment in certain exceptional cases of first-degree murder, it did not permit the imposition of a life sentence based solely upon the facts determined by a jury in arriving at its guilty verdict. ***  To increase the sentencing range from the 20-to-60-year range set forth in section 5-8-1(a)(1)(a), the sentencing judge must first find an additional fact, not decided by the jury.  Without the required additional finding, the judge is constrained by law to impose a sentence no more severe than imprisonment for 60 years.  Hence, a 60-year prison term is the most punishment to which an accused is exposed on the facts assigned to the jury for determination."  
Nitz
, 319 Ill. App. 3d at 968.

The record includes some evidence that the victim provoked defendant by driving after the car in which he rode and crashing into that car after it turned around.  But we find that the trial court did not abuse its discretion by refusing the second degree murder instruction because the severe beating of the unresponsive victim was disproportionate to the provocation.  Although the prosecutors made several improper arguments, defendant failed to object.  We cannot say that the improper arguments deprived defendant of a fundamentally fair trial or that the comments amount to plain error.  Following 
Nitz
, we find the extended term sentencing statute unconstitutional as applied to defendant, and therefore we modify the sentence to a term of 60 years in the custody of the Department of Corrections.

Affirmed as modified.

COHEN, P.J. and COUSINS, J., concur.